Mark A. Adler  MA8703
Paul R. Berger
Richard W. Grime
Charles E. Cain
**Attorneys for Plaintiff**
**Securities and Exchange Commission**
450 Fifth Street, N.W.
Washington, D.C.  20549-0911
(202) 942-4770 (Adler)
(202) 942-9581 (Fax)

**Local Counsel:**

Michael A. Chagares  MC5483
Chief, Civil Division
United States Attorney's Office
District of New Jersey
970 Broad Street
Newark, New Jersey  07102
(973) 645-2839

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,    ) <br><br> Plaintiff,    ) <br><br> v.    ) <br><br> LUCENT TECHNOLOGIES INC.,    ) <br> NINA AVERSANO,    ) <br> JAY CARTER,    ) <br> ALICE LESLIE DORN,    ) <br> WILLIAM PLUNKETT,    ) <br> JOHN BRATTEN,    ) <br> DEBORAH HARRIS,    ) <br> CHARLES ELLIOTT,    ) <br> VANESSA PETRINI,    ) <br> MICHELLE HAYES-BULLOCK and    ) <br> DAVID ACKERMAN,    ) <br> Defendants.    ) <br>    ) | Civil Action No. <br><br> **COMPLAINT** <br><br> **JURY DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

### ADDRESSES OF THE PARTIES

1.      The address of the Commission is 450 Fifth Street, N.W., Washington, D.C.  The principal executive offices of Lucent Technologies Inc. ("Lucent") are located in Murray Hill, New Jersey.  Nina Aversano resides in Kinnelon, New Jersey.  Jay Carter resides in Far Hills, New Jersey.  Alice Leslie Dorn ("Leslie Dorn" or "Dorn") resides in New York, New York.  William Plunkett resides in Little Rock, Arkansas.  John Bratten resides in Alpharetta, Georgia.  Deborah Harris resides in Shaker Heights, Ohio.  Charles Elliott resides in Roswell, Georgia.  Vanessa Petrini resides in Davidsonville, Maryland.  Michelle Hayes-Bullock resides in Orange, New Jersey.  David Ackerman resides in McLean, Virginia.

### SUMMARY OF ALLEGATIONS

2.      Lucent fraudulently and improperly recognized approximately $1.148 billion dollars of revenue and $470 million in pre-tax income in violation of Generally Accepted Accounting Principles ("GAAP") during its fiscal year 2000 (October 1, 1999 to September 30, 2000).  As a result, Lucent improperly overstated its pre-tax income for its fiscal year 2000 by 16 percent.  $511 million of revenue and $91 million in pre-tax income were recognized prematurely in quarterly results during Lucent's fiscal year 2000.  The remaining $637 million in revenue and $379 million in pre-tax income should not have been recognized at all during Lucent's fiscal year 2000.  Lucent subsequently adjusted its results by $679 million in revenue prior to the filing of its Form 10-K for fiscal 2000.

3.      Lucent's violations of GAAP were due to the fraudulent and reckless actions of the defendants and were also the result of deficient internal controls that led to

numerous accounting errors by others. In their drive to realize revenue, meet internal sales targets and/or obtain sales bonuses, Nina Aversano, Jay Carter, Leslie Dorn, William Plunkett, John Bratten, Deborah Harris, Charles Elliott, Vanessa Petrini, and Michelle Hayes-Bullock, in their respective capacities as officers, executives and employees of Lucent improperly granted, and/or failed to disclose, various side agreements, credits and other incentives (collectively "extra-contractual commitments") to induce Lucent's customers to purchase the company's products. These extra-contractual commitments were made in at least ten transactions in fiscal 2000, and Lucent violated GAAP by recognizing revenue on these transactions both in circumstances: (a) where it could not be recognized under GAAP; and (b) by recording the revenue earlier than was permitted under GAAP.

4.      In carrying out their fraudulent conduct, these officers, executives and employees of Lucent violated and circumvented Lucent's internal accounting controls, falsified documents, hid side agreements with customers, failed to inform personnel in Lucent's corporate finance and accounting structure of the existence of the extra-contractual commitments or, in some instances, took steps to affirmatively mislead them.

5.      In addition to the fraudulent conduct by Lucent's own employees, David Ackerman, who at the time was an officer of Winstar Communications Inc. ("Winstar"), engaged in a scheme with William Plunkett that resulted in Lucent misrecording a software purchase by Winstar at the end of Lucent's fourth quarter of fiscal year 2000. His fraud included signing a document that disguised the timing of a side agreement in connection with that sale. By engaging in such conduct, Ackerman aided and abetted Lucent's fraud.

6.      In addition to the fraudulent conduct, Lucent improperly recorded other transactions as a result of its failure to maintain a system of internal accounting controls sufficient to provide reasonable assurances that the company's financial statements were prepared in conformity with GAAP.

7.      On November 21, 2000, Lucent announced that it had identified a revenue issue impacting $125 million of revenue in its fourth quarter of fiscal year 2000. Immediately following that announcement, Lucent's stock dropped approximately 16 percent.  On December 21, 2000, Lucent announced that it had identified an additional $554 million in revenue issues and that its fiscal year 2000 revenue would be reduced by a total of $679 million.   Immediately following that announcement, Lucent's stock dropped by approximately 13 percent.  $637 million of the $679 million of improperly recognized revenue identified by Lucent is included in the $1.148 billion dollars of improperly recognized revenue identified in paragraph two above.

## JURISDICTION

8.      The Commission brings this action pursuant to Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)].

9.      This Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

10.      In connection with the transactions, acts, practices, and courses of business described in the complaint, the defendants, directly or indirectly, used the means or instrumentalities of interstate commerce, the mails, or the facilities of a national securities exchange.

## THE DEFENDANTS

11.     Lucent is a provider of communications networks for the world's largest communications service providers.    It designs and provides systems, services and software.    Lucent was incorporated in Delaware in November 1995, and was formed from the systems and technology units that were formerly a part of AT&T Corporation ("AT&T") and were spun off by AT&T on September 30, 1996.    Lucent's principal executive offices are located at 600 Mountain Avenue, Murray Hill, New Jersey 07974.

12.     Lucent is a public company whose securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act and it is required to file periodic reports with the Commission pursuant to Section 13 of that Act.    Lucent's stock trades on the New York Stock Exchange under the symbol LU.

13.     Nina Aversano, age 59, was a corporate officer and President of Lucent's North American Sales and Service Provider Networks from 1998 to 2000.    For fiscal year 2000, Aversano's area of responsibility accounted for approximately $26.5 billion, or 78%, of Lucent's total sales.

14.     Jay Carter, age 54, was a corporate officer and President of Lucent's AT&T customer business unit from July of 1997 to September of 2000, with global responsibility for sales and marketing of Lucent product to AT&T.    From May to September of 2000, Carter reported directly to Aversano.

15.     Leslie Dorn, age 57, was Lucent's Vice President of Indirect Sales for North America (distributors) from November 1998 until approximately December 2000, and reported directly to Aversano.

16.     John Bratten, age 54, has been Lucent's sales Vice President for the BellSouth region since April 2000.

17.     William Plunkett, age 56, was Vice President for Lucent's Emerging Service Provider customer business unit, which included the Winstar account.

18.     Deborah Harris, age 48, was sales Vice President for the Winstar account within the Emerging Service Provider customer business unit from August 2000 until October 2001. Harris reported to Plunkett in September 2000.

19.     Michelle Hayes-Bullock, age 46, was a Lucent Finance Director with CFO responsibilities for the AT&T customer business unit from January 2000 to January 2001, and reported to Jay Carter through September 2000.

20.     Charles J. Elliott, age 61, was a Lucent Senior Manager with contract management responsibility for the BellSouth customer team from 1984 until August 2001.

21.     Vanessa Petrini, age 43, was Assistant Vice President for the Winstar Customer Team in September 2000, and reported directly to Harris.

22.     David Ackerman, age 59, was an officer of Winstar and Executive Vice President, Business Development and Strategic Planning from June 1994 until January 2001. He was responsible for corporate strategy and business development.

## DESCRIPTION OF LUCENT'S FRAUDULENT TRANSACTIONS

23.     Lucent knowingly or recklessly filed materially false financial statements with the Commission in Forms 10-Q for the first three quarters of its fiscal year 2000 and in a Form 8-K filed on October 24, 2000 with regard to its fourth quarter results. Lucent knowingly or recklessly misrepresented its revenues and pre-tax income as substantially

greater than they were in these filings with the Commission and other public disclosures, including earnings releases and statements by senior management to shareholders. Additionally, Lucent failed to implement sufficient internal controls and procedures to ensure compliance with GAAP.

24.     The aggregate impact of the undisclosed accounting actions resulted, among other things, in Lucent:

        a.   Overstating its revenue in fiscal year 2000 by over $1 billion; and

        b.   Overstating its pre-tax income in fiscal year 2000 by approximately $470 million, or 16 percent.

### Distributor Transactions
### Nina Aversano and Leslie Dorn

25.     Starting at least as early as the first quarter of Lucent's fiscal year 2000 (October to December 1999), Aversano and Dorn engaged in a pattern and practice of orally granting Anixter International, Inc. ("Anixter") and Graybar Electric Company ("Graybar") (Lucent's top two distributors) certain rights and privileges beyond those contained in their respective distribution agreements with Lucent.  These rights and privileges were granted both directly by Aversano and Dorn, and on occasion through their subordinates.  The nature of these rights and privileges was such that it was improper under GAAP for Lucent to recognize revenue at the point of sale to the distributor.

26.     While the specific rights and privileges granted to Anixter and Graybar varied from transaction to transaction, the general nature of the agreements was that if these distributors took the product offered by Lucent they would not get hurt in a given transaction; that Lucent would assist them in moving the product to end-customers; and

that Lucent would accept a return of the product if sales to the end-customers did not materialize.

27.    GAAP, as summarized in FASB Concepts Statement No. 5 ("CON 5"), prohibits recognition of revenue in financial statements unless and until it is realizable and earned.  FASB Statement No. 48 ("FAS 48") identifies particular circumstances where claimed revenues may not be recognized because they are not sufficiently realizable or earned.  In violation of these standards, Lucent improperly recognized revenue despite substantial evidence that the recorded amount was not realizable or earned, or in circumstances where significant uncertainties remained regarding whether the amount was realizable and earned.

28.    Historically, those uncertainties were properly considered and reflected in Lucent's accounting by recording these transactions as consignment sales, with revenue deferred until resale by the distributor.  During Lucent's fiscal year 1999 until the end of its fiscal year 2000, Lucent modified its arrangements and recognized revenue upon delivery to the distributors.  By doing so, Lucent violated GAAP in several instances because the extra-contractual commitments resulted in significant uncertainties surrounding those transactions.

29.    Specifically, Aversano and Dorn protected the distributors from the substantive risks of a reseller by granting unrestricted product substitutions, pricing concessions, holding cost reimbursements, and remarketing assistance, thereby violating key conditions of revenue recognition in FAS 48 – such as paragraphs 6(a), 6(b), and 6(e).  In addition, in violation of another key condition for revenue recognition under FAS 48, Lucent was unable to estimate, or in any case did not estimate, reasonably likely

8

product returns that would occur as a result of the undocumented return rights granted to distributors that went well beyond the product substitution levels stipulated in their distributor contracts.

30.     As described above, during Lucent's fiscal year 1999 until the end of its fiscal year 2000, Lucent modified its prior accounting policy and recognized revenue upon delivery to the distributors. This change in accounting policy followed Aversano's request in approximately early 1999 that Anixter assist Lucent in developing an indirect sales model -- sales through distributors -- in the carrier telecommunications space, an area where Lucent had previously sold its own product directly to end users – a direct sales model. The product lines Aversano sought to shift to an indirect sales model were comprised of sophisticated equipment such as telecommunication switches and optical products that are often manufactured specifically for an end user and are not readily saleable to other customers absent significant modification.

31.     A senior Anixter executive told Aversano that Lucent would need to provide significant assistance in connection with the transition to an indirect sales model. Aversano assured the senior Anixter executive that Anixter would not be burdened with the ultimate financial responsibility for those goods taken if the transition to an indirect model was not successful. From the assurances given by Aversano, the senior Anixter executive understood that Anixter would not get stuck with any inventory they took that was targeted to this new market.

32.     Consistent with what other Anixter executives were later told by Dorn, Aversano told the senior Anixter executive that if sales did not go through as contemplated, Lucent would substitute the product that Anixter bought for another

9

product that its customer might need, Lucent would find other customers for Anixter to sell the Lucent product to and, if that did not work, Lucent would take the product back.

33.    In addition to the broad assurances given by Aversano to Anixter as described above, Aversano and Dorn also gave explicit extra-contractual assurances in connection with specific sales transactions.  The transactions in which Aversano and Dorn granted Anixter and Graybar rights and privileges beyond those contained in their respective distribution agreements with Lucent include: (1) the sale to Anixter of approximately $335 million of product over the course of Lucent's fiscal years 1999 and 2000 for resale to MCI/Worldcom; (2) the sale to Anixter of approximately $38 million of 400G optical networking product at the end of Lucent's first quarter of fiscal year 2000; (3) the sale to Anixter of $89 million of product over the course of Lucent's second and third quarters of fiscal year 2000 for resale to ICG Communications, Inc. ("ICG"); (4) the sale to Graybar of approximately $250 million of product over the course of Lucent's first through third quarters of fiscal year 2000 for resale to U.S. West Communications, Inc. ("U.S. West"); and (5) the sale to Graybar of approximately $61 million of optical networking product in Lucent's third quarter of fiscal 2000 for resale to three competitive local exchange carriers identified by Lucent.

34.    Despite the fact that Aversano and Dorn knew, or were reckless in not knowing, that the verbal agreements entered into in connection with these transactions made revenue recognition improper under GAAP, they nevertheless failed to inform Lucent's CFO structure of the existence of those agreements.  Moreover, on some occasions Aversano and Dorn affirmatively misrepresented facts to members of Lucent's CFO structure.

## The Fourth Quarter Sale

35.    The representations and misrepresentations Aversano and Dorn made in connection with the sale of approximately $110 million of product to Anixter at the end of Lucent's fourth quarter in September 2000 ("Fourth Quarter Sale") are typical of their pattern and practice described above.  This sale is a portion of the $335 million of product sold to Anixter over the course of Lucent's fiscal years 1999 and 2000 for resale to MCI/Worldcom as described above.

36.    In connection with the Fourth Quarter Sale, a senior Anixter executive told Aversano and Dorn that the exposure was too great on Anixter's part to take on any more Lucent product without additional assurances that Anixter would be able to redeploy the inventory to customers other than MCI/Worldcom, or that Anixter could return the product if necessary.  In the presence of Dorn, Aversano assured the senior executive that this would not be an issue and that Lucent would not let Anixter down.  In June 2000, in response to similar concerns expressed by Anixter executives in connection with an approximately $122 million dollar sale at the end of Lucent's third quarter of fiscal year 2000, Aversano gave similar assurances to Anixter executives in the presence of Dorn. As with the Fourth Quarter Sale, the product sold to Anixter in Lucent's third quarter was intended for resale to MCI/Worldcom.

37.    As part of the negotiations for the Fourth Quarter Sale, another senior Anixter executive requested that Aversano put the right of return for the product in writing.  Aversano told him that she could not put it in writing, and instead orally represented to him that Lucent would take the product back if it didn't sell to MCI/WorldCom.

11

38.    While she would not put the right of return in writing, Aversano did execute a Letter of Understanding ("LOU") with Anixter on September 29, 2000 as part of the Fourth Quarter Sale.  The LOU provided, among other things, that if after six months Anixter had not sold the equipment, it would have exclusive rights to sell it into certain markets.  Lucent's Chief Accountant had seen drafts of the LOU that included provisions that are impermissible from a revenue recognition perspective, and explicitly told Aversano that she could not agree to include such commitments.  A right of return was among the impermissible provisions contained in drafts leading up to the LOU.

39.    Lucent's Chief Accountant was concerned about the fact that impermissible provisions had been included in drafts of the LOU, and, therefore, he later specifically asked Aversano if the executed LOU was in fact the entire agreement, and if there was anything else proposed.  In response, Aversano falsely told the Chief Accountant that the LOU was indeed the full agreement between the parties, despite the fact that she had made the additional oral representations discussed above.

40.    In addition to her false representations to Lucent's Chief Accountant, on October 12, 2000, Aversano knowingly or recklessly executed a management representation letter for the fourth quarter of fiscal year 2000 which, among other things, falsely stated that her area of responsibility had no "(1) agreements to repurchase or accept returns of inventory sold to customers, including distributors, other than for restocking as provided in distributorship agreements or (2) future performance obligations, other than normal warranty obligations, with respect to inventory sold to customers, including distributors."  Aversano knew that Lucent's auditor would rely on

this false letter in connection with its review of Lucent's fourth quarter 2000 financial statements and in connection with its fiscal year end audit procedures.

41.    Dorn also made direct representations and commitments to Anixter executives in connection with the Fourth Quarter Sale and the other sales comprising the $335 million of product sold to Anixter over the course of Lucent's fiscal years 1999 and 2000 for resale to MCI/Worldcom as described above.  Between the mid-first quarter of 1999 through October 2000, Dorn gave assurances to an Anixter executive on multiple occasions that if a sale did not go through as contemplated, Lucent would substitute the product that Anixter bought for another product that its customer might need, Lucent would find other customers for Anixter to sell the Lucent product to and, if that did not work, Lucent would take the product back.  At times, Dorn advised the Anixter executive that she needed to get Aversano's approval before making these commitments to Anixter. In addition, Dorn's assurances reflected the same assurances that Aversano made to an Anixter executive.

42.    Despite the numerous extra-contractual commitments made by Aversano and Dorn, when questioned by Lucent's Chief Accountant in the June to July 2000 timeframe, Dorn falsely told him that there were no verbal agreements or side deals that would indicate there were any rights of return above the 5 percent stock balancing provisions noted in the distributor agreement.

43.    In the October to November 2000 timeframe, Leslie Dorn acknowledged to a senior Anixter executive that commitments had been made to Anixter, and that if the equipment was not deployable elsewhere, Anixter was not going to have to continue to carry it.

13

## Optical Equipment Sale to Anixter

44.     As described above, at the end of Lucent's first quarter of fiscal year 2000, Lucent sold approximately $38 million of optical equipment to Anixter.  In connection with this sale, Dorn represented to multiple Anixter executives that the product would move or that it could be returned to Lucent.  Moreover, Dorn explicitly stated in connection with this sale that Aversano had authorized the right of return.

45.     Anixter was unable to sell a majority of this material, and Lucent paid holding fees to Anixter until the inventory was ultimately returned to Lucent in September of 2000.

## Sales to Anixter for resale to ICG

46.     In connection with these sales of product totaling approximately $89 million as described above, Dorn, at the direction of, or with the knowledge and approval of Aversano, gave an Anixter executive assurances that Anixter would not get hurt in these transactions – including the right to return the product if the sales did not work out. Additionally, Dorn agreed to provide Anixter with a holding fee to compensate Anixter for each day the resale to ICG was delayed beyond the projected resale dates, and to compensate it for any outstanding receivable balances from ICG.  Lucent ultimately agreed to make Anixter whole with regard to approximately $46 million in unpaid receivables it had from ICG.

## Sales to Graybar for resale to U.S. West

47.     In connection with the over $250 million in sales to Graybar for resale to U.S. West that occurred over the course of Lucent's first through third quarters of fiscal year 2000 as described above, Dorn made or authorized numerous specific

representations to Graybar employees at the direction of, or with the knowledge and approval of Aversano. Similar to representations made to Anixter in connection with the Fourth Quarter Sale, Graybar executives were told by Dorn that the Lucent product would be off Graybar's books by the end of the year (December 31, 2000); that Lucent would reconfigure the Lucent product and arrange its sale to another regional bell operating company if sales to U.S. West didn't work out; and that Graybar would not get hurt in the transactions.

48.    Nearly all of the product that Graybar purchased at the end of Lucent's second and third quarters of fiscal year 2000 was returned by Graybar to Lucent in December of 2000.

### Third Quarter Sale to Graybar

49.    As with the sales for U.S. West, in connection with the sale of approximately $61 million of Lucent optical networking product to Graybar at the end of Lucent's third quarter of fiscal year 2000 as described above, Dorn, at the direction of, or with the knowledge and approval of Aversano, represented to a Graybar executive that Graybar would not get hurt in the transaction, and that Lucent would help them sell the product to other customers if the transactions did not work out as contemplated.

50.    As presented by Dorn to the Graybar executive, the deal envisioned Graybar reselling Lucent's product to three competitive local exchange carriers that Lucent had already identified.  The transactions did not occur, and Graybar ultimately returned the product to Lucent in December 2000.

**Effect of Distributor Transactions on Lucent's Reported Financial Results**

51.    Aversano and Dorn each acted with knowledge or recklessly engaged in the above described fraudulent conduct.  As a result of Aversano and Dorn's fraudulent conduct, Lucent violated GAAP by recognizing revenue at the point of sale on these transactions.  Aversano and Dorn knew, or were reckless in not knowing, that as a result of the fraudulent conduct, Lucent filed materially misstated Forms 10-Q with the Commission for the first three quarters of its fiscal year 2000, and that revenue was improperly included in Lucent's October 23, 2000 unaudited financial statements that were filed with the Commission in a Form 8-K on October 24, 2000.  In December 2000, Lucent ultimately agreed to take back $352 million in inventory that Anixter and Graybar had been unable to sell.  In total, Aversano and Dorn's fraudulent conduct resulted in Lucent materially overstating its pre-tax income for fiscal year 2000 by approximately 7 percent.

**Winstar Software Pool Transaction**

**William Plunkett, Deborah Harris, Vanessa Petrini, and David Ackerman**

52.    In September 2000, William Plunkett negotiated, with the assistance of Lucent's Winstar sales team members Deborah Harris and Vanessa Petrini, the sale of $135 million worth of software in a software pool transaction with David Ackerman of Winstar.   The software pool arrangement allowed Winstar to select software by September 29, 2001, and Lucent to recognize $135 million in revenue in its fiscal year ending September 30, 2000.  After the parties agreed to and properly documented a $10 million credit, Lucent recognized $125 million on the software pool transaction in its 2000 fiscal year.

53.    This transaction was particularly important to Lucent because the entire amount of revenue was recorded as pre-tax income without any off-setting expense. However, such revenue was recognized in violation of GAAP due to actions of William Plunkett, Deborah Harris, Vanessa Petrini, and David Ackerman.

54.    In September 2000 during the negotiations for the software pool agreement, Ackerman told Plunkett that the pool of software to be purchased by Winstar was worth only about $25 million to the company. As a result, and before committing to pay more than this amount, Ackerman needed additional value from Lucent. At that time, Ackerman understood Lucent's critical need to recognize revenue in its fiscal year ending September 30, 2000, and used that leverage to gain very favorable additional terms for Winstar. Responding to pressure from Lucent's senior management, including Aversano, to recognize revenue, Plunkett reached an agreement with Ackerman in which Winstar would pay Lucent $135 million for the software and the parties would separately document additional elements of the software pool transaction that would give Winstar additional value. The additional value came in the form of a $35 million credit to be applied to Winstar's future purchases, a $45 million credit expected to comprise substantially all the cost of a network integration laboratory for Winstar, and reduced pricing for Winstar on purchases of equipment for building and hub sites ("the side agreements").

55.    Before the parties signed the software pool agreement on September 29, 2000, Ackerman asked that Lucent put the side agreements in writing. Plunkett agreed to Ackerman's request. At that time, both Plunkett and Ackerman knew that the software pool agreement and the side agreements were elements of a single transaction.

56.    To ensure that Lucent's accountants would not deduct the value of Lucent's obligations documented in the side agreements from the $125 million Lucent would recognize on the software pool agreement in September 2000, Plunkett instructed Petrini to draft and post-date three letters documenting the side agreements with fictitious dates in October. The effect of the post-dated letters was to create the appearance that the side agreements were reached after September 30, 2000 and were not connected to the software pool agreement. Petrini drafted and post-dated the letters as instructed and Plunkett signed the post-dated letters on September 29, 2000. Plunkett and Petrini kept the post-dated letters in their files, did not circulate them outside the sales team (except as to Ackerman), and did not make further copies.

57.    Ackerman received the three executed post-dated letters on September 29, 2000 and knew that they did not accurately portray the entire software pool transaction. Nevertheless, Ackerman agreed to Plunkett's post-dating of Lucent's obligations thereby creating the false appearance that they had been agreed to after September 30, 2000. Ackerman also counter-signed the letter dealing with reduced pricing on purchases of equipment for building and hub sites. Ackerman post-dated that letter October 20, 2000 and sent that executed letter back to Plunkett on September 29, 2000. All three letters were eventually resent to Ackerman at Winstar on their fictitiously stated dates in October 2000. Ackerman counter-signed the letter dealing with reduced pricing on purchases of equipment for building and hub sites again on October 20, faxed the letter to Plunkett, and destroyed the original post-dated letter.

58.    Deborah Harris understood that Winstar would not utilize the entire $135 million of software, and therefore Winstar wanted additional value in exchange for its

agreement to pay $135 million for that software. During the negotiations for the software pool agreement, Petrini and Harris also knew that Lucent had agreed to provide the side agreements to Winstar and that the software pool agreement and the side agreements were elements of a single transaction. Petrini told Harris that Plunkett and Petrini had documented the side-agreements in post-dated letters. Petrini, Harris, Plunkett, and Ackerman knew, or were reckless in not knowing, that if the credits and discounts had been properly recorded by Lucent in the same quarter that the software pool agreement was executed, Lucent would not have recognized $125 million on the transaction.

59.    On October 4, 2000, a member of Lucent's CFO structure with responsibility for Lucent's Winstar sales team emailed Harris and Petrini specifically requesting any information regarding discounts or incentives offered by Lucent to Winstar, other than the $10 million credit that had been properly documented. Despite knowing of the existence of the side agreements and the true nature of the concessions granted to Winstar, Harris and Petrini nevertheless failed to disclose the other aspects of the software pool agreement to the accountant.

### Effect of Winstar Software Pool Transaction on Lucent's Reported Financial Results

60.    By not taking the three credits and discounts into account, Lucent improperly recorded $125 million in revenue and pretax income in its fourth fiscal quarter of 2000 in violation of GAAP. That amount represented 26 percent of Lucent's pre-tax income for its fourth fiscal quarter 2000, and 4 percent of Lucent's pre-tax income for fiscal year 2000. That amount was included in Lucent's October 23, 2000 unaudited financial statements filed with the Commission on October 24, 2000 in a Form 8-K.

61.     Plunkett, Harris, Petrini, and Ackerman each acted with knowledge or recklessly engaged in the above described fraudulent conduct. Each knew, or was reckless in not knowing, that as a result of the fraudulent conduct, Lucent filed materially false financial statements with the Commission in the Form 8-K.

## AT&T Wireless Services Transaction
## Jay Carter and Michelle Hayes-Bullock

62.     Starting in approximately the summer of 1999, Lucent and AT&T Wireless Services, Inc. ("AWS") began to negotiate a new business model known as Voice Path Pricing ("VPP"). Under VPP, AWS would no longer pay Lucent for the individual pieces of equipment that make up a telecommunications network as they had done traditionally ("conventional pricing"). Instead, AWS would pay a price for each voice path – in essence pay for each data/voice connection that could be handled on the finished network.

63.     The parties initially anticipated VPP would take effect on April 1, 2000, but the new contract was not ultimately signed until August 2000. While the VPP agreement continued to be negotiated, Jay Carter authorized his subordinates to enter into a verbal agreement with their AWS counterparts. Through that verbal agreement, Lucent and AWS agreed that VPP would be retroactively applied to product purchased between April 1, 2000 and the date the agreement was ultimately reached ("interim period"). As part of this side agreement, any pricing differential between VPP and conventional pricing for product purchased during the interim period would be adjusted through credits via a "true-up" process once the VPP agreement was finalized. In effect, the parties agreed to have VPP commence on April 1, 2000.

64.    Michelle Hayes-Bullock, who was the CFO for Lucent's AT&T customer business unit, was aware that an oral side agreement had been entered into with AWS because she had been explicitly told about it, both by a subordinate in the finance division and by at least one of the sales executives who made the agreement on behalf of Lucent. As CFO for Lucent's AT&T customer business unit, Hayes-Bullock was responsible for ensuring that Lucent's financial statements complied with GAAP for transactions originating within that unit.

65.    During the interim period, Lucent provided AWS with switching equipment valued at $53 million under conventional pricing.  The switching equipment was provided to AWS without a purchase order, and, as a result, appeared in certain internal Lucent reports as inventory that had been shipped but not invoiced.  In order to recognize revenue on the switches, Carter instructed his subordinates to obtain a purchase order from AWS for the switches.  AWS provided a purchase order at the end of Lucent's third quarter of fiscal year 2000 with the explicit understanding that – in conformity with the original oral understanding – Lucent would provide a credit for the invoiced amount and that AWS would ultimately pay the VPP price for the equipment.

66.    On June 30, 2000, at the end of Lucent's third quarter of fiscal year 2000, this switching equipment was invoiced under conventional pricing and Lucent violated GAAP by recognizing revenue and operating income in the amount of $53 million. Carter and Hayes-Bullock knew, or were reckless in not knowing, that Lucent's recognition of the revenue and operating income violated GAAP.  Carter and Hayes-Bullock also took affirmative steps to mislead Lucent's Chief Accountant about the existence and nature of the side agreement with AWS.

67.    Despite her knowledge of the verbal side-agreement, Hayes-Bullock drafted, and/or assisted in drafting, a letter to Lucent's Chief Accountant that falsely suggested that there were no credit agreements with AWS. Carter executed versions of that letter on both September 8 and September 26, 2000.

68.    In the September 8, 2000 letter, Carter falsely represented that the June 30, 2000 invoice to AWS for the switches was "payable when due and that any credits earned will be applied against future purchase for wireless products." The September 26, 2000 letter distorted the truth even further, stating that "[i]f as in the past, Lucent were to offer AT&T credits in return for future volume purchases, they would be earned by AT&T when the volume commitments were achieved," – falsely suggesting Lucent had not even offered AWS an opportunity to earn credits.

69.    Under CON 5, before Lucent can recognize revenue in a given transaction, the revenue must be both realizable and earned. To be realizable, collection of the sales price must be reasonably assured. Moreover, notwithstanding the actual delivery and transfer of title to the switches, FAS 48 requires that the price AWS will ultimately pay be fixed and determinable.

70.    The result of the side agreement authorized by Carter was that the price AWS would ultimately pay for the switches was not fixed and determinable, because the ultimate price under VPP had not been determined. Further, Lucent could have no expectation that it would collect $53 million for the switching equipment because the parties had agreed AWS would receive an offsetting $53 million credit. Thus, collection of the sales prices was not reasonably assured, and CON 5's realizable criterion for revenue recognition was not met.

### Effect of AT&T Wireless Services Transaction
### on Lucent's Reported Financial Results

71.     Carter and Hayes-Bullock each acted with knowledge or recklessly engaged in the above described fraudulent conduct.  As a result of their fraudulent conduct, Lucent materially overstated pre-tax income by $53 million, or 13 percent, in its financial statements filed with the Commission in Form 10-Q for its third quarter of fiscal year 2000.  Carter and Hayes-Bullock knew, or were reckless in not knowing, that, as a result of their fraudulent conduct, Lucent filed materially false financial statements with the Commission in Form 10-Q for its third quarter of fiscal year 2000.

### BellSouth Software Pooling Transaction
### John Bratten and Charles Elliott

72.     On September 30, 2000, Lucent and BellSouth Telecommunications, Inc. ("BellSouth") entered into a software pooling agreement, called LOA 105, which obligated BellSouth to pay Lucent $95 million by April 1, 2001 for software that it had to select by September 30, 2002.  To induce BellSouth to enter into LOA 105, John Bratten agreed to provide BellSouth with a $20 million credit and a 2 percent price discount (valued at $1 million).

73.     Bratten failed to notify Lucent's CFO structure that he had agreed to the credit and discount as part of the software pooling transaction.

74.     In addition to not disclosing the credit and discount internally, on October 10, 2000, Bratten executed a letter to BellSouth that falsely represented that the credit and discount had been granted on that date rather than in September.  The letter was drafted by Charles Elliott, who had been present during the final negotiations and knew that

Bratten had granted the credit and discount in September as an inducement for BellSouth to enter into LOA 105.

75.     When questioned by members of Lucent's CFO structure - including the Chief Accountant - about the granting of the credit and price discount, Bratten and Elliott each initially maintained that the credit and discount were <u>not</u> connected to LOA 105 and had been granted in order to facilitate the execution of a new Global Purchase Agreement with BellSouth.  Bratten and Elliott ultimately admitted to Lucent's Chief Accountant that the credit and discount had been granted as part of LOA 105.  However, those admissions came after Lucent had already included the full amount of revenue and operating income in a financial statement filed with the Commission.

### Effect of BellSouth Software Pooling Transaction on Lucent's Reported Financial Results

76.     Bratten and Elliott each acted with knowledge or recklessly engaged in the above described fraudulent conduct.  As a result of their fraudulent conduct, Lucent violated GAAP by recording the entire $95 million as revenue and operating income from this transaction in its fourth quarter of fiscal year 2000.  Lucent should only have recorded $74 million in total revenue and operating income due to the $20 million credit and 2 percent price discount (valued at $1 million).  Bratten and Elliott's fraudulent conduct resulted in Lucent materially overstating pre-tax income by approximately 4 percent in its financial statements filed with the Commission in a Form 8-K on October 24, 2000.  Bratten and Elliot knew, or were reckless in not knowing, that, as a result of their fraudulent conduct, Lucent filed materially false financial statements with the Commission in the Form 8-K.

## The Global Crossing Bill and Hold Transaction

77.      Lucent improperly recognized $58 million in revenue in March 2000 on the sale of optical networking equipment to Global Crossing Ltd. ("Global Crossing"). Lucent improperly characterized this transaction as a qualifying "bill and hold" transaction even though it did not in fact fulfill the requirements necessary under GAAP to allow revenue recognition on a bill and hold basis.

78.      In March 2000, Global Crossing agreed to purchase $58 million of optical networking equipment from Lucent by the end of the month – which coincided with the end of Lucent's second quarter of fiscal year 2000.  Lucent did not, however, ship the equipment to Global Crossing or invoice Global Crossing for the equipment at that time.  Instead, Lucent held the equipment in its warehouse and agreed to extend its payment terms to allow Global Crossing to pay for the equipment as it was installed into its network.

79.      GAAP allows revenue to be recognized on bill and hold transactions where the *buyer* requests the transaction on a bill and hold basis, and not where the seller induces the buyer to conduct the transaction as a bill and hold.  Here, Lucent, the seller, initiated the transaction.  Further, Lucent extended its normal billing terms to allow Global Crossing to pay for the equipment when it deployed the equipment in its network, indicating that Global Crossing did not need the equipment by March 31, 2000.

80.      As a result of a lack of sufficient internal controls, Lucent violated GAAP by recognizing $58 million of revenue in circumstances that failed to fulfill the requirements for revenue to be recognized on a bill and hold transaction.  The $58 million

of revenue was improperly included in Lucent's Form 10-Q for the period ending March 31, 2000, and filed with the Commission on May 10, 2000.

## LTOS Transaction

81.    During Lucent's second quarter of fiscal year 2000, it sold equipment valued at approximately $90 million to Lucent Technologies of Shanghai, Ltd. ("LTOS") and recognized the full amount of revenue at that time.  However, the products had been sold with unrestricted rights of return granted in a side-letter by Lucent's Vice President, Optical Network Group, China, to facilitate the establishment of that market.

82.    Due to a lack of sufficient internal controls, Lucent's CFO structure was unaware that LTOS had been granted a right of return in connection with the sale.  As a result, Lucent violated GAAP by recognizing $90 million of revenue and $6 million of operating income in its second quarter of fiscal year 2000.  These amounts were improperly included in Lucent's Form 10-Q for the period ending March 31, 2000, filed with the Commission on May 10, 2000.  Lucent reversed the transaction in its fourth fiscal quarter of 2000, and therefore it was not included in Lucent's October 23, 2000 unaudited financial statements that were filed with the Commission in a Form 8-K on October 24, 2000.

## The Allegiance Telecom Transaction

83.    In September 2000, Allegiance Telecom, Inc. ("Allegiance") agreed to purchase $28 million worth of switching hardware and software from Lucent.  On September 29, 2000, Allegiance sent Lucent a letter confirming receipt of the hardware, but did not confirm receipt of the software or installation of the hardware.  Based on that

letter, Lucent recognized $28 million in revenue on the transaction in its quarter ended September 30, 2000.

84.    The appropriate accounting treatment for the transaction was governed by Statement of Position 97-2, Software Revenue Recognition ("SOP 97-2"), since the transaction included the sale of software, as well as hardware and installation services. SOP 97-2 disallows revenue recognition on a multiple element arrangement, such as this one, where certain elements have not been accepted and vendor specific objective evidence of the fair value of those elements has not been established.

85.    When Lucent recognized the revenue in September 2000, it had neither received an acceptance certificate for the software and installation services, nor did it have vendor specific objective evidence of the fair value of the software and installation services.  Because Lucent failed to fulfill all of the elements necessary for revenue recognition under SOP 97-2, it should have deferred recognition of any revenue on the transaction until all elements of the transaction were completed.

86.    Nevertheless, due to a lack of sufficient internal controls, Lucent violated GAAP by improperly recognizing $28 million in revenue from this transaction in its fourth quarter of fiscal year 2000.  That amount was included in Lucent's financial statements in a Form 8-K filed with the Commission on October 24, 2000.

## FIRST CLAIM FOR RELIEF

### Violation of Section 10(b) of the Exchange Act
### [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

87.    Paragraphs 1 through 86 are hereby realleged and incorporated herein by reference as if set forth fully.

27

88.    As set forth more fully above, defendants Lucent Technologies Inc., Nina Aversano, Jay Carter, Leslie Dorn, William Plunkett, John Bratten, Deborah Harris, Charles Elliott, Vanessa Petrini, and Michelle Hayes-Bullock, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national exchange, in connection with the purchase or sale of Lucent securities, have, with knowledge or recklessly, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit upon any person.

89.    By reason of the foregoing, defendants Lucent Technologies Inc., Nina Aversano, Jay Carter, Leslie Dorn, William Plunkett, John Bratten, Deborah Harris, Charles Elliott, Vanessa Petrini, and Michelle Hayes-Bullock have violated Section 10(b) of the Exchange Act and Rule 10b-5.

90.    In addition, and, in the alternative, Nina Aversano, Jay Carter, Leslie Dorn, John Bratten, Charles Elliott, and Michelle Hayes-Bullock knowingly provided substantial assistance to Lucent in violation of Section 10(b) of the Exchange Act and Rule 10b-5 and are each liable as aiders and abetters of these violations.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] (Ackerman)

91.    Paragraphs 1 through 90 are hereby realleged and incorporated herein by reference as if set forth fully.

28

92.     As detailed above, David Ackerman acted with knowledge or recklessly, and thereby knowingly provided substantial assistance to Lucent in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

93.     By reason of the foregoing, Ackerman aided and abetted Lucent's violation of Section 10(b) of the Exchange Act and Rule 10b-5.

### THIRD CLAIM FOR RELIEF

**Violation of Section 13(a) of the Exchange Act**
**[15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-11, and 13a-13**
**[17 C.F.R. §§ 240.12b-20, 240.13a-11, and 240.13a-13]**

94.     Paragraphs 1 through 93 are hereby realleged and incorporated herein by reference as if set forth fully.

95.     By engaging in the conduct described above, Lucent filed materially false and misleading financial statements with the Commission in Forms 10-Q for the first three quarters of its fiscal year 2000 and in a Form 8-K filed on October 24, 2000 with regard to its fourth quarter results.

96.     By reason of the foregoing, Lucent violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11, and 13a-13.

97.     By engaging in the conduct described above, Nina Aversano and Leslie Dorn caused Lucent to file materially false and misleading financial statements with the Commission in Forms 10-Q for the first two quarters of its fiscal year 2000; Nina Aversano, Leslie Dorn, Jay Carter, and Michelle Hayes-Bullock caused Lucent to file materially false and misleading financial statements with the Commission in a Form 10-Q for the third quarter of its fiscal year 2000; and Nina Aversano, Leslie Dorn, William Plunkett, John Bratten, Deborah Harris, Charles Elliott, Vanessa Petrini, and David

Ackerman caused Lucent to file materially false and misleading financial statements with the Commission in a Form 8-K filed on October 24, 2000 with regard to its fourth quarter results.

98.    By reason of the foregoing, Nina Aversano, Jay Carter, Leslie Dorn, William Plunkett, John Bratten, Deborah Harris, Charles Elliott, Vanessa Petrini, Michelle Hayes-Bullock, and David Ackerman knowingly provided substantial assistance to Lucent and each aided and abetted Lucent's violation of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11.

99.    Additionally, by engaging in the conduct described above, Nina Aversano, Jay Carter, Leslie Dorn, and Michelle Hayes-Bullock knowingly provided substantial assistance to Lucent and each also aided and abetted Lucent's violation of Rule 13a-13 of the Exchange Act.

## FOURTH CLAIM FOR RELIEF

### Violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]

100.    Paragraphs 1 through 99 are hereby realleged and incorporated herein by reference as if set forth fully.

101.    By engaging in the conduct described above, Lucent failed to keep books, records, and accounts which accurately and fairly reflected the transactions and disposition of its assets, in violation of Section 13(b)(2)(A) of the Exchange Act, and failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that Lucent's corporate transactions were executed in accordance with management's authorization and in a manner to permit the preparation of

financial statements in conformity with generally accepted accounting principles in violation of Section 13(b)(2)(B) of the Exchange Act.

102. By reason of the foregoing, Lucent violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

103. By engaging in the conduct described above, Nina Aversano, Jay Carter, Leslie Dorn, William Plunkett, John Bratten, Deborah Harris, Charles Elliott, Vanessa Petrini, Michelle Hayes-Bullock, and David Ackerman aided and abetted Lucent's failures to keep books, records, and accounts which accurately and fairly reflected the transactions and disposition of its assets, in violation of Section 13(b)(2)(A) of the Exchange Act, and further aided and abetted Lucent's failures to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that Lucent's corporate transactions were executed in accordance with management's authorization and in a manner to permit the preparation of financial statements in conformity with GAAP in violation of Section 13(b)(2)(B) of the Exchange Act.

104. By reason of the foregoing, Nina Aversano, Jay Carter, Leslie Dorn, William Plunkett, John Bratten, Deborah Harris, Charles Elliott, Vanessa Petrini, Michelle Hayes-Bullock, and David Ackerman knowingly provided substantial assistance to Lucent and each aided and abetted Lucent's violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

## FIFTH CLAIM FOR RELIEF

### Violation of Section 13(b)(5) of the Exchange Act
### [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1]

105. Paragraphs 1 through 104 are hereby realleged and incorporated herein by reference as if set forth fully.

106. By engaging in the conduct described above, Nina Aversano, Jay Carter, Leslie Dorn, William Plunkett, John Bratten, Deborah Harris, Charles Elliott, Vanessa Petrini, and Michelle Hayes-Bullock each knowingly circumvented Lucent's system of internal accounting controls and each knowingly falsified, or caused to be falsified, Lucent's books and records. In so doing, they each violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1.

## SIXTH CLAIM FOR RELIEF

### Violation of Rule 13b2-2 [17 C.F.R. § 240.13b2-2]
### (Aversano)

107. Paragraphs 1 through 106 are hereby realleged and incorporated herein by reference as if set forth fully.

108. By engaging in the conduct described above, Nina Aversano directly or indirectly made or caused to be made materially false or misleading statements or omitted or caused others to omit to state material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to accountants in connection with audits or examinations of Lucent's required financial statements or in connection with the preparation and filing of documents and reports required to be filed with the Commission, in violation of Exchange Act Rule 13b2-2.

109. By reason of the foregoing, Aversano violated Exchange Act Rule 13b2-2.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter final judgments:

32

A.     Permanently restraining and enjoining Lucent Technologies Inc. from violating Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-11, and 13a-13;

B.     Permanently restraining and enjoining Nina Aversano, Jay Carter, Leslie Dorn, John Bratten, Charles Elliott, and Michelle Hayes-Bullock from violating, or aiding and abetting violations of, Section 10(b) of the Exchange Act and Rule 10b-5, from violating Section 13(b)(5) of the Exchange Act and Rule 13b2-1, and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11;

C.     Permanently restraining and enjoining William Plunkett, Deborah Harris, and Vanessa Petrini from violating Sections 10(b) and Section 13(b)(5) of the Exchange Act and Rules 10b-5 and Rule 13b2-1, and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11;

D.     Permanently restraining and enjoining Nina Aversano from violating Rule 13b2-2;

E.     Permanently restraining and enjoining Nina Aversano, Jay Carter, Leslie Dorn, and Michelle Hayes-Bullock from aiding and abetting violations of Rule 13a-13;

F.     Permanently restraining and enjoining David Ackerman from aiding and abetting violations of Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules10b-5, 12b-20, and 13a-11;

G.     Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)], barring Nina Aversano, Jay Carter, William Plunkett, and Deborah Harris from acting as

an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. §78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. §78o];

      H.     Ordering Lucent Technologies Inc., Nina Aversano, Jay Carter, Leslie Dorn, William Plunkett, John Bratten, Deborah Harris, Charles Elliott, Vanessa Petrini, Michelle Hayes-Bullock, and David Ackerman to disgorge ill-gotten gains, with prejudgment interest, including, but not limited to, salaries and other benefits wrongfully obtained as a result of their fraudulent conduct;

      I.     Ordering Lucent Technologies Inc., Nina Aversano, Jay Carter, Leslie Dorn, William Plunkett, John Bratten, Deborah Harris, Charles Elliott, Vanessa Petrini, Michelle Hayes-Bullock, and David Ackerman to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and

      J.     Granting such other additional relief as this Court may deem just and proper.

Dated: May 17, 2004           Respectfully submitted,

*Mark A Adler*

Mark A. Adler  MA8703
Paul R. Berger
Richard W. Grime
Charles E. Cain
Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth St., N.W.
Washington, D.C. 20549-0911
(202) 942-4770 (Adler)
(202) 942-9581 (Fax)