**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| | : | **OPINION** |
| Plaintiff, | : | |
| | : | Civ. No. 04-2315 (WHW) |
| v. | : | |
| | : | |
| LUCENT TECHNOLOGIES, INC., et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**<u>Walls, Senior District Judge</u>**

Defendants in this civil enforcement action brought by the Securities and Exchange Commission ("SEC") are Lucent Technologies, Inc. ("Lucent") and its executives and employees. The SEC alleges that defendants violated the Exchange Act of 1934 by improperly recognizing revenue and pre-tax income in violation of generally accepted accounting principles ("GAAP"). Lucent and several of the individual defendants have reached out-of-court settlements with the SEC and have been dismissed from the case. Four defendants, all former senior executives and managers at Lucent, remain. Three defendants - Jay Carter, Michelle Hayes-Bullock, and Alice Leslie Dorn - now separately move for summary judgment on all counts. Nina Aversano moves for partial summary judgment on the primary liability claim in the first count only. Defendants Carter and Hayes-Bullock jointly move to strike the expert reports of Sally L. Hoffman, SEC's accounting expert. The Court heard oral arguments on March 31, 2009. Aversano's motion for partial summary judgment on the primary violation of Section 10(b) is granted. Dorn's motion for summary judgment is granted as to the primary violation

**FOR PUBLICATION**

claim in the first count only and denied as to the aiding and abetting claim in the same count and

the remaining counts.  The motions of Carter and Hayes-Bullock for summary judgment are

granted as to first, third and fourth counts and denied as to the fifth count.  The motion to strike

the expert reports of Sally L. Hoffman is denied.  Because the motions implicate similar factual

and legal issues, they will be discussed together in this opinion.

**BACKGROUND**[1]

This matter arises out of sales of telecommunications equipment by Lucent and its

recognition of revenues from those sales in fiscal year 2000.[2]  The principal allegations against

all defendants are that defendants authorized or approved verbal side agreements, credits or other

incentives in connection with those sales to induce Lucent's customers to purchase equipment.

These extra-contractual commitments, according to the SEC, cast substantial doubt on Lucent's

ability to collect payment on these sales and made recording of revenues improper under GAAP.[3]

The improper revenue recognition caused Lucent to materially overstate pre-tax income in its

financial statements filed with the SEC.  The SEC's charges against Aversano and Dorn are

based on their role in five transactions with two of Lucent's top distributors.  The SEC's claims

---

[1]  There are numerous disputes of fact between the parties.  There is also intense
disagreement as to the legal import of these disputed facts.  Here, the Court will briefly
summarize the factual and procedural background of this case, reserving a fuller discussion of the
facts to the relevant analytical sections of this opinion.

[2]  Lucent's fiscal year preceded the calendar year by one quarter; thus, its fiscal year 2000
began on October 1, 1999 and ended on September 30, 2000.

[3]  Under GAAP, revenues cannot be booked unless and until they are "realizable and
earned."  Financial Accounting Standards Board ("FASB") Statement No. 5.

**FOR PUBLICATION**

against Carter and Hayes-Bullock stem from their involvement in Lucent's sale of four wireless

network switches to AT&T Wireless Services.

Distributor Transactions - Aversano and Dorn

During Lucent's fiscal year 2000, Aversano was President of Lucent's North American

Regional sales division.  (Aversano's Statement of Undisputed Facts ("Aversano Facts") ¶ 1.)

Dorn was Vice President of Indirect Sales for North America and reported directly to Aversano.

(SEC's Omnibus Statement of Facts in Opposition to Aversano's and Dorn's Mots. ("SEC Facts

- Aversano/Dorn") ¶ 1.)

Aversano and Dorn, as sales executives, had limited responsibilities in preparing Lucent's

financial statements: Neither was involved in the drafting and review of financial statements, but

each was expected to fully disclose to Lucent's accounting department the terms of all sales

contracts they entered into or authorized so that the transactions could be properly accounted for.

(Aversano Facts ¶¶ 7-11; Dorn's Statement of Undisputed Facts ("Dorn Facts") ¶¶ 15-17, 21-24.)

Neither Aversano nor Dorn had expertise in accounting but each had a general awareness of

revenue recognition principles.  (SEC Facts - Aversano/Dorn ¶¶ 15-17; Dorn Facts ¶¶ 15-17.)

The SEC alleges that Aversano and Dorn gave oral extra-contractual assurances to

Anixter and Graybar, two distributors of Lucent, in connection with at least five transactions that

made recognizing revenues from these sales improper.  These transactions included:

    (1)    The sale to Anixter of approximately $335 million of product over the course of
             Lucent's fiscal years 1999 and 2000 for resale to MCI/Worldcom;
    (2)    The sale to Anixter of approximately $38 million of optical networking product at
             the end of Lucent's first quarter of fiscal year 2000;
    (3)    The sale to Anixter of $89 million of product over the course of Lucent's second
             and third quarters of fiscal year 2000 for resale to ICG Communications, Inc.;

FOR PUBLICATION

> (4)     The sale to Graybar of approximately $250 million of product over the course of Lucent's first through third quarters of fiscal year 2000 for resale to U.S. West Communications;
>
> (5)     The sale to Graybar of approximately $61 million of optical networking product in Lucent's third quarter of fiscal year 2000 for resale to three local exchange carriers.

(SEC Opp'n Br. to Aversano's Mot. at 11; SEC Opp'n Br. to Dorn's Mot. at 7.)  While the details of the oral assurances varied from transaction to transaction, their general nature was that if the distributors took the product offered by Lucent they would not get "hurt" in a given transaction.  (SEC Facts - Aversano/Dorn ¶¶ 65, 68, 103, 114, 125.)  Specifically, Aversano and Dorn promised that Lucent would assist them in moving the product to end-customers, (id. ¶¶ 23, 27, 114), and accept a return of the product if sales to the end-customers did not materialize.  (Id. ¶¶ 23, 25, 27, 35, 37, 47, 52, 55, 57, 60, 64, 69, 77.)

According to the SEC, Aversano and Dorn kept these oral assurances secret from Lucent's accounting personnel.  In addition, on October 12, 2000, Aversano executed a management representation letter for the fourth quarter of fiscal year 2000 which stated:

> "We acknowledge our fiduciary responsibilities to ensure that the highest degree of integrity is inherent in the preparation of financial statements for Lucent and its core business units.  We are responsible for the fair presentation in the financial statements of the [North American region's] financial position and results of operations in conformity with generally accepted accounting principles."

(SEC Facts - Aversano/Dorn ¶ 143.)  This letter also falsely stated that Aversano had made no: "(1) agreements to repurchase or accept returns of inventory sold to customers, including distributors, other than for restocking as provided in distributorship agreements or (2) future obligations, other than normal warranty obligations, with respect to inventory sold to customers,

-4-

FOR PUBLICATION

including distributors." (Id.)  The SEC alleges that these false representations or failures to

inform caused Lucent to materially overstate its revenues and income.

AWS Transaction  - Carter and Hayes-Bullock

From July 1997 to September 2000, defendant Jay Carter was president of Lucent's

AT&T Customer Business Unit ("ACBU") with global responsibility for sales and marketing of

Lucent's products to AT&T.  (Carter's Statement of Undisputed Facts ("Carter Facts") ¶¶ 1-2.)

Defendant Michelle Hayes-Bullock was a finance manager assigned to support ACBU.[4]  (Hayes-

Bullock's Statement of Undisputed Facts ("Hayes-Bullock Facts") ¶ 2.)

Like Aversano and Dorn, Carter had limited responsibilities in preparing Lucent's

financial statements but was expected to fully disclose all terms of sales contracts to the

accounting department.  (SEC's Omnibus Statement of Facts in Opposition to Carter's and

Hayes-Bullock's Mots. ("SEC Facts - Carter/Hayes-Bullock") ¶¶ 5-9; SEC Omnibus Opp'n Br.

to Carter's and Hayes-Bullock's Mot. at 25.)  Carter also signed management representation

letters regarding ACBU's financial results.  (SEC Facts - Carter/Hayes-Bullock ¶¶ 9, 100-101.)

In contrast, Hayes-Bullock, as the most senior finance manager assigned to support ACBU, had

direct responsibility for ensuring accuracy of ACBU financial statements.  (Id. ¶ 19.)

_____

[4]  The parties vigorously dispute whether Hayes-Bullock was the Chief Financial Officer
for the ACBU.  Hayes-Bullock insists that she was merely a representative from the Corporate
Finance Organization assigned to support the ACBU.  The confusion apparently stems from the
fact that the Corporate Finance Organization has the same acronym (CFO) as Chief Financial
Officer.  In any event, Hayes-Bullock's official title is immaterial to this motion.  Both parties
agree on the material point which is that she was the most senior finance person assigned to the
ACBU.  (Hayes-Bullock Facts ¶ 9.)

**FOR PUBLICATION**

Starting in the summer of 1999, Lucent and AT&T Wireless Services, Inc. ("AWS"), a division of AT&T, began negotiating a new business model known as Voice Path Pricing ("VPP"). (SEC Facts - Carter/Hayes-Bullock ¶¶ 28-29; Carter Facts ¶ 50.) Under VPP, AWS would no longer pay Lucent for each individual piece of equipment that makes up a telecommunications network as they had done previously under the General Purchase Agreement ("GPA"). (SEC Facts - Carter/Hayes-Bullock ¶ 30.) Instead, AWS would pay for each "voice path" – in essence, pay for each data/voice connection that could be handled on the finished network. (Id.)

While negotiations on the VPP agreement were continuing, the SEC contends that Carter authorized his subordinates to orally propose, and that AWS agreed, that VPP would retroactively apply to products purchased by AWS between April 1, 2000 and the date the VPP agreement was finally reached. (SEC Facts - Carter/Hayes-Bullock ¶ 39.) Under this oral agreement, the parties would order and ship equipment as usual with the understanding that any differential between the VPP and conventional price for products purchased during this interim period would be credited back to AWS via a "true-up" process once the VPP agreement was finalized. (Id. ¶ 43.) In effect, the SEC claims, the parties agreed to have VPP commence on April 1, 2000. (Id.)

During the third quarter, Lucent provided four switches to AWS without a purchase order and invoice. (SEC Facts - Carter/Hayes-Bullock ¶ 72.) In order to recognize the revenue, Carter instructed his subordinates to obtain a purchase order from AWS for the switches. (Id. ¶ 76.) AWS provided a purchase order with the express understanding that – in conformity with the

FOR PUBLICATION

original oral promise – Lucent would provide a credit for that invoiced amount and that AWS would ultimately pay the VPP price for the switches.  (Id. ¶ 77.)  On June 30, 2000, at the end of Lucent's third quarter of fiscal year 2000, the switches were invoiced under the GPA and recognized as revenue.  (Id. ¶ 80.)  This, the SEC alleges, was improper under GAAP because the revenue from the switches, as a result of the verbal agreement to make VPP retroactive to April 1, 2000, was not fixed and realizable.  According to the SEC, Hayes-Bullock knew of these improprieties and failed to object despite her duty to do so.

Defendants dispute the SEC's version of events but also argue that these fact disputes are immaterial and do not preclude summary judgment in their favor.  The various counts of securities violations alleged against each defendant are:

Count 1:    Primary violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder against all defendants and aiding and abetting violations against the same provisions against all defendants;

Count 3:    Aiding and abetting violations of Section 13(a) of the Exchange Act, Rules 12b-20, 13a-11 and 13a-13 against all defendants;

Count 4:    Aiding and abetting violations of Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act against all defendants;

Count 5:    Violation of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 against all defendants

Count 6:    Violation of Rule 13b2-2 promulgated under the Exchange Act against Aversano.

In 2005, Hayes-Bullock successfully moved to dismiss the primary violation claim under the first count.  See S.E.C. v. Lucent Technologies, Inc., 363 F. Supp. 2d 708, 719-24 (D.N.J. 2005) ("Lucent I").  All defendants, except Aversano, now move for summary judgment on all counts.  Aversano moves for partial summary judgment on the primary violation claim in the first count only.  The Court heard oral arguments on these motions on March 31, 2009.

-7-

**FOR PUBLICATION**

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986). A factual dispute is material if, under the substantive law, it would affect the outcome of the suit and it is genuine if a reasonable jury could return a verdict for the non-moving party. See id. at 248. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" in question. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). To survive a motion for summary judgment, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The non-moving party must go beyond the pleadings and, by affidavits or other evidence, designate specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 323-24. "Conclusory statements, general denials, and factual allegations not based on personal knowledge [are]

-8-

FOR PUBLICATION

insufficient to avoid summary judgment." Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d

1141, 1146 (3d Cir. 1972).

At the summary judgment stage, the court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue for

trial. See Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and

inferences in the light most favorable to the non-moving party. See id. at 255; Curley v. Klem,

298 F.3d 271, 276-77 (3d Cir. 2002).

## DISCUSSION

**I.      Primary Liability under Section 10(b)**

*A.      Legal Standard*

Section 10(b) of the Exchange Act of 1934 protects investors by making it unlawful "to

use or employ, in connection with the purchase or sale of any security ..., any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the [Securities

and Exchange] Commission may prescribe as necessary or appropriate in the public interest or

for the protection of investors." 15 U.S.C. § 78j(b). The SEC, pursuant to this section,

promulgated Rule 10b-5, which makes it unlawful:

> (a) to employ any device scheme, or artifice to defraud,
> (b) to make any untrue statement or a material fact or to omit to state a material
> fact necessary in order to make the statements made, in the light of the
> circumstances under which they were made, not misleading, or
> (c) to engage in any act, practice, or course of business which operates or would
> operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

FOR PUBLICATION

The majority of Section 10(b) and Rule 10b-5 actions are brought under Rule 10b-5(b) for false or misleading statements or omissions.  To establish a violation of Rule 10b-5(b), the SEC must prove that the defendant: (1)  made a materially false statement or omitted a material fact, (2) with scienter, (3) in connection with the purchase or sale of a security.  See S.E.C. v. Adoni, 60 F. Supp. 2d 401, 405 (D.N.J. 1999).  Unlike a private litigant, the SEC need not prove either reliance or damages.  See GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 206 n.6 (3d Cir. 2001); United States v. Haddy, 134 F.3d 542, 549 (3d Cir. 1998).

The SEC here brings its claims not only under Rule 10b-5(b), but also under the more general provisions of Rule 10b-5(a) and (c) which prohibit the use of "any device, scheme, or artifice to defraud" or the participation "in any act, practice, or course of business" that would perpetrate fraud on investors.[5]  Although Rule 10b-5(b) requires a plaintiff to allege and prove that an untrue statement of a material fact (or omission) was made, "[t]he first and third subparagraphs [of Rule 10b-5] are not so restricted."  Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153, 92 S. Ct. 1456, 1472 (1972).  As the Supreme Court recently clarified, "conduct itself can be deceptive," Stoneridge, 128 S. Ct. at 769, and deceptive conduct alone may premise liability under Section 10(b) and Rule 10b-5.  See id.  To state a claim based on conduct violating Rule 10b-5(a) and (c), a private plaintiff must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance. See In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 336

---

[5]  Liability under subsections (a) and (c) of Rule 10b-5 is sometimes referred to as "scheme liability."  See Stoneridge Investment Partners, LLC., v. Scientific-Atlanta, Inc., __ U.S. ___, 128 S. Ct. 761, 770 (2008).

FOR PUBLICATION

(S.D.N.Y. 2004) (citation omitted); accord In re Royal Dutch/Shell Transport Sec. Litig., 380 F.

Supp. 2d 509, 559-60 (D.N.J. 2005).  As in Rule 10b-5(b) actions, the SEC need not prove

reliance.

        B.      *Motion to Strike the SEC's Expert*

Carter and Hayes-Bullock first argue that all claims asserted against them should be

dismissed because the SEC cannot establish, as a threshold matter, that there was a misstatement

with respect to the revenue recognition of the four switches.  Defendants emphasize that all four

negotiators of the VPP contract testified that, as of June 30, 2000, when revenue was booked in

Lucent's fiscal third quarter 2000 under traditional pricing, there was still no agreement on

material terms of the VPP contract.  According to defendants, the negotiators understood that the

four switches would only be paid for under the VPP if and when there was a final agreement on

the VPP contract.  In other words, the defendants argue that because the oral agreement which

would have affected the pricing of the four switches was contingent on a future event,

recognizing revenue for the switches in the third quarter was not improper under GAAP.

To buttress this thesis, Carter and Hayes-Bullock move to strike the SEC's expert, Sally

L. Hoffman, on the ground that she has made an impermissible "factual finding."  Defendants

charge that Ms. Hoffman's opinion that Lucent violated GAAP is based on her incorrect and

unsupported factual determination that the oral promise was not contingent.  Defendants note that

if the Court were to strike Ms. Hoffman's opinion, only their expert's opinion that Lucent

committed no underlying GAAP violation would stand and that the Court should grant summary

judgment on that basis.

FOR PUBLICATION

The SEC argues that defendants' motion is improper both procedurally[6] and on the merits

because defendants are really arguing that the SEC's expert is substantively incorrect.  The SEC

asserts that there is no basis to strike Ms. Hoffman's testimony because her opinion is based on

sound accounting principles and ample evidence in the record.

1.      **Daubert Standard**

Rule 702 of the Federal Rules of Evidence governs the standards applicable for admission

of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto
> in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to the
> facts of the case.

Fed. R. Evid. 702.  The Third Circuit has held that Rule 702 "embodies a trilogy of restrictions

on expert testimony: qualification, reliability and fit."  Schneider ex rel. Schneider v. Fried, 320

F.3d 396, 404 (3d Cir. 2003) (citations omitted).  Defendants do not challenge the qualifications

of Ms. Hoffman.  They do, however, complain that her opinion lacks reliability and fit.

For an expert opinion to be reliable, it must be based on "valid reasoning and reliable

methodology. . . . The analysis of the conclusions themselves is for the trier of fact when the

---

[6]  The SEC complains in a footnote that the motion to strike is procedurally improper
because it was filed without seeking leave.  See Magistrate Judge Falk's December 15, 2006
Case Management Order, ¶ 15 (*"No motions are to be filed without prior written permission
from this Court"*) (emphasis in original).  Because this motion to strike is integrally connected to
the motions for summary judgment filed on the same date and is substantively dispositive, the
motion is properly before the Court.

FOR PUBLICATION

expert is subjected to cross-examination.'"  Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir.

2000) (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806-07 (3d Cir. 1997)).  In

exercising its "gatekeeper" function under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509

U.S. 579, 113 S. Ct. 2786 (1993), the district court must ensure "an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the same

level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho

Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167 (1999).  Still, a "judge should not

exclude evidence simply because he or she thinks that there is a flaw in the expert's investigative

process which renders the expert's conclusions incorrect.  [A] judge should only exclude the

evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her

conclusions"  In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 746 (3d Cir. 1994).

 As a final criterion of assessing proposed expert testimony, Rule 702 requires that the

testimony fit the issues in the case.  "In other words, the expert's testimony must be relevant for

the purposes of the case and must assist the trier of fact." Schneider, 320 F.3d at 404.  With these

principles in mind, the Court examines Ms. Hoffman's opinion.

   **2.**  **Analysis**

 Ms. Hoffman's principal opinion with respect to defendants Carter and Hayes-Bullock is

that "the $53 million [AWS] transaction did not meet the GAAP criteria for revenue recognition;

it should not have been recognized in Lucent's third fiscal 2000 quarter [ending on June 30,

2000]."  (SEC Opp'n to Carter and Hayes-Bullock's Joint Motion to Strike, Exh. A (Expert

Report of Sally L. Hoffman) at 33.)

-13-

FOR PUBLICATION

In reaching her opinion, she first explained the following accounting principles:

"GAAP are the entire body of principles generally accepted by accountants as appropriate in accounting for an entity's financial transactions." (Id. at 13.)

"Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Financial Statements of Business Enterprises ("CON 5"), which provides guidance on revenue recognition, requires that 'in order for revenue to be recognized it must be realized, or realizable, and earned.'" (Id. at 13.)

"Accounting Research Bulletin No. 43 ("ARB 43"), which also addresses revenue recognition, states that revenue should not be recognized at the time of a sale in the ordinary course of business if 'the collection of the sale price is not reasonably assured.'" (Id. at 14.)

"The concept of "substance over form" requires that the accounting for a transaction should follow its substance, not just the form. Thus, where the form of the transaction (for example, the written contract or other formal evidence of the transaction) differs from the financial impact, the financial impact, not the form should dictate the accounting." (Id. at 14.)

Applying these principles to the factual record, Ms. Hoffman concluded that the $53 million in revenue was: (1) not realizable; (2) not collectible; and (3) the price of the switches was not fixed and determinable. (Id. at 33-34.)

The SEC states that the motion to strike should be denied because this is a classic battle of the experts.[7] Defendants dispute this, noting that the experts do not disagree on accounting

_____

[7] The SEC also characterizes defendants' argument as a rehashing of the argument that Carter raised in his unsuccessful motion to dismiss. Carter argued then that fraud claims cannot be based on contingent future events or where GAAP supports the revenue recognition at issue. See Lucent I, 363 F. Supp. 2d. at 714-15. The Court rejected the first claim because the allegations against Carter were unlike forward-looking statements, opinions and representations about future events which are un-actionable as a matter of law under Section 10(b). See id. at 715. The Court rejected the second part of Carter's argument because whether a given transaction's accounting is consistent with GAAP was largely a question of fact which cannot be determined on a motion to dismiss. See id. (citing In re Burling Coat Factory Sec. Litig., 114 F.3d 1410, 1421 (3d Cir. 1997)). Still, the Third Circuit has not precluded litigants from raising

-14-

**FOR PUBLICATION**

principles.  Rather, Ms. Hoffman's opinion is objectionable to defendants because it is based on a

factual assumption not present in the record.  See Mercedez-Benz, 2008 WL 2830962, *12.

Defendants liken Ms. Hoffman to the experts excluded by this Court in Mercedez-Benz who had

simply relied on speculation and subjective belief of their clients regarding damages.  See id. at

*13.  The comparison is inapposite, however, because unlike the experts in that case, Ms.

Hoffman here extensively examined the voluminous record to arrive at her conclusions.

The Court finds no Daubert basis to exclude Ms. Hoffman's opinion.  Ms. Hoffman relied

on the factual record and applied sound accounting principles to reach her opinion.  That she

disregarded certain testimony the defendants find particularly helpful to their cause is not a

cognizable basis to exclude her expert reports.  The appropriate medium to attack any

weaknesses in Ms. Hoffman's opinion is vigorous cross-examination, not a motion to strike.  The

motion to strike is denied.  Because the motion is denied, there remain disputes of fact as to

whether Lucent misstated its revenues and income.  Carter's and Hayes-Bullock's attempt to

obtain summary judgment based on this ground therefore fails.

C.    *Defendants' Liability for False Statements in Lucent's Financial Statements*

In its April 6, 2005 Opinion, the Court dismissed the primary liability claim against

Hayes-Bullock because the scant factual allegations of her fraudulent conduct in the Complaint

did not pass the "bright line" test.  See S.E.C. v. Lucent Technologies, Inc. ("Lucent I"), 363 F.

Supp. 2d 708, 719-24 (D.N.J. 2005).  In adopting the "bright line" test as the appropriate

a defense based on consistency with GAAP in a summary judgment motion.  See In re
Westinghouse Sec. Litig., 90 F.3d 696, 709 n.9 (3rd Cir.1996).  This is what Carter, joined by co-
defendant Hayes-Bullock, is doing here.

-15-

FOR PUBLICATION

standard to apply for primary liability under Section 10(b), the Court noted the absence of Third

Circuit precedent and surveyed the then prevailing case law.  See id. at 720-22.  The Court

considered the various tests which had emerged following the Supreme Court's decision in

Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S. Ct.

1439 (1994) and concluded that the "bright line" test used by the Second and Eleventh Circuits

was more consistent with the statutory language of Section 10(b) and Central Bank.  See Lucent

I. 363 F. Supp. 2d at 720-24.  The Court also weighed whether to adopt a different standard for

primary liability actions brought by the SEC than for those pursued by private plaintiffs but

declined to do so for two principal reasons.  First, the test for primary liability should not be so

similar to that for secondary liability to blur the line between primary and secondary liability.

See id. at 724.  Second, the adoption of the "bright line" test did not mean that culpable actors

falling outside the test would escape punishment because a cause of action for aiding and

abetting remained available to the SEC.  See id.

        Carter, Aversano, and Dorn each contend that they are not primarily liable for misleading

statements in Lucent's books under the "bright line" test because none of them "made" the

alleged misstatements.  In response, the SEC urges the Court to reconsider the "bright line" test

in light of the Supreme Court's recent decision, Stoneridge Investment Partners, LLC., v.

Scientific-Atlanta, Inc., 128 S. Ct. 761 (2008).  In its opposition, the SEC argues that even if the

Court were not inclined to depart from the law of the case, each defendant is primarily liable.  At

oral argument, however, the SEC conceded that none of the defendants would be primarily liable

under this Court's bright line test.  (Hr'g Tr. 55:6-58:15, Mar. 31, 2009.)

FOR PUBLICATION

The "law of the case" doctrine provides that "when a court 'decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" United States v. Kikumura, 947 F.2d 72, 77 (3d Cir. 1991) (quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816, 108 S. Ct. 2166 (1988)) (further citations omitted).  The doctrine does not limit the court's power; it instead directs the tribunal's exercise of discretion, see Arizona v. California, 460 U.S. 605, 618, 103 S. Ct. 1382 (1983), although the scope and nature of this discretion is limited.  See Christianson, 486 U.S. at 817 ("[C]ourts should be loathe to [revisit earlier decisions] in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'").  One circumstance which warrants a court's reconsideration is where there has been an intervening change in controlling law.  See Davis v. United States, 417 U.S. 333, 342, 94 S. Ct. 2298 (1974) (Court of Appeals erred in adhering to law of the case doctrine despite intervening Supreme Court precedent); NL Indus., Inc., v. Commercial Union Ins., Co., 65 F.3d 314, 324 n.8 (3d Cir. 1995) (district court's failure to reconsider earlier decision following change in controlling precedent was error).

The SEC claims that the Stoneridge decision compels this Court to reconsider the "bright line" test because it declares new law.  Stoneridge involved equipment vendors who entered into sham transactions with a cable TV operator (Charter) that allowed Charter to improperly inflate its reported operating revenues and cash flow.  See 128 S. Ct. at 766.  The Eight Circuit had dismissed the plaintiff's claims under 10b-5(a) and (c) holding that "[a] device or contrivance is not 'deceptive' within the meaning of § 10(b), absent some misstatement or a failure to disclose

-17-

**FOR PUBLICATION**

by one who has a duty to disclose." In re Charter Comm., Inc. Sec. Litig., 443 F.3d 987, 992 (8th

Cir. 2006) aff'd sub nom on other grounds Stoneridge, 128 S. Ct. 761.  The Supreme Court

rejected that view noting that it would be "erroneous" to suggest that "there must be a specific

oral or written statement before there could be liability under § 10(b) or Rule 10b-5."

Stoneridge, 128 S. Ct. at 769.  Instead, Justice Kennedy, writing for the majority (5-3, Breyer, J.,

recusing), emphasized that "[c]onduct itself can be deceptive," describing the defendants'

conduct as involving "deceptive acts." Id. at 769.  The Supreme Court thus recognized that

deceptive conduct in the absence of "specific oral or written statement" may create primary

liability under Section 10(b).  See id.  But the Stoneridge Court ultimately concluded that the

defendant vendors could not be held liable because petitioners could not demonstrate, as required

in private actions, that they had relied on the defendants' statements or conduct.  See id. at 770.

The majority appears to have acknowledged, however, that the SEC enforcement power would

have reached the defendants' conduct here because the SEC need not prove reliance.  See id.

("[I]t is true that if business operations are used, as alleged here, to affect securities markets, the

SEC enforcement power may reach the culpable actors").

     The Court is unpersuaded that Stoneridge provides guidance on the appropriateness of the

"bright line" test as the SEC contends.  Although the SEC places much emphasis on the

following language in Stoneridge, "[i]f [it is suggested] that there must be a specific oral or

written statement before there could be liability under § 10(b) or Rule 10b-5, it would be

erroneous," id. at 769, only an out-of-context reading could lend support for the SEC's

proposition that the Supreme Court disapproves of the "bright line" test.  Stoneridge concerned

**FOR PUBLICATION**

the scope of so-called "scheme liability" for defendants who perpetrated fraud through conduct, a theory of liability separate and distinct from liability resulting from making misstatements.  See 128 S. Ct. at 770.  The Supreme Court in Stoneridge did not mention or discuss the "bright line" test, a standard for determining whether a defendant can be subject to primary liability for making an alleged *misstatement*.

Moreover, by articulating its concern about expanding the reach of scheme liability so far that the aiding and abetting claims could be revived under the guise of scheme liability claim, the Supreme Court repudiated the expansive view of primary liability urged by the SEC in this case. See id. at 771.  In rejecting the petitioner's position that primary liability is appropriate when persons "engage[] in conduct with the purpose and effect of creating a false appearance of material fact to further a scheme to misrepresent," id. at 770, Justice Kennedy wrote,

> [p]etitioner's view of primary liability makes any aider and abettor liable under §
> 10(b) if he or she committed a deceptive act in the process of providing assistance.
> Were we to adopt this construction of § 10(b), it would revive in substance the
> implied cause of action against all aiders and abettors except those who committed
> no deceptive act in the process of facilitating the fraud....

Id. at 771 (internal citations omitted).

Read in its entirety, Stoneridge weakens rather than supports the SEC's position here. From Central Bank to Stoneridge, the Supreme Court has consistently narrowed the class of defendants reachable by the implied cause of action under Section 10(b).  The above language indicates that the Supreme Court wishes to police the line between primary liability and aiding and abetting liability strictly.  This in turn suggests that the Supreme Court would prefer the

FOR PUBLICATION

"bright line" test, which sharply delineates the line between the two types of liability, over the alternative tests.

      The SEC next asserts that recent decisions from the Tenth Circuit and the Southern District of New York further confirm that the rigid "bright line" test is inappropriate for determining primary liability in SEC enforcement actions.  At the outset, it should be noted that the SEC's reliance on Tenth Circuit law is misplaced because this Court has already noted that the Tenth Circuit's version of the "bright line" test does not require attribution but still decided to require attribution in this SEC enforcement action.  See Lucent I, 363 F. Supp. 2d at 723.

      A number of district courts in the Southern District of New York have addressed the applicability of the "bright line" test in SEC enforcement cases and has decided that the SEC should not be required to prove attribution because the attribution requirement has roots in reliance.  See, e.g., S.E.C. v. Collins & Aikman Corp., 524 F. Supp. 2d 477, 490 (S.D.N.Y. 2007); S.E.C. v. KPMG, LLP, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006).  In Collins & Aikman Corp., the court reasoned that "[i]f the attribution requirement is motivated by the need to show reliance, which [the court] find[s] to be the more cogent analysis, then it does not apply to actions brought by the SEC."  524 F. Supp. 2d at 490; see also KPMG, 412 F. Supp. 2d at 375 (because the SEC need not prove reliance, "there appears to be no reason to impose a requirement that a misstatement have [sic] been publicly attributed to a defendant for liability to attach").  Thus, the SEC need only allege that the defendant "caused the statement to be made[] and knew or had reason to know that the statement would be disseminated to investors." Collins & Aikman, 524 F. Supp. 2d at 490 (quoting KPMG, 412 F. Supp. 2d at 375).  This formulation, the KPMG court

FOR PUBLICATION

concluded, "covers a narrower scope of conduct, and therefore a smaller class of defendants, than would be implicated by the 'substantial participation' test rejected by the Second Circuit in Wright."  412 F. Supp. 2d at 375.

In addition, the Second Circuit has not been altogether consistent in applying the "bright line" test in private actions and have imposed liability on culpable actors although the misstatements were not made in their name or attributed to them.  See, e.g., In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 75-76 (2d Cir. 2001); Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 100-101 (2d Cir. 2001).  In Scholastic, the Second Circuit upheld a ruling that a company vice president could be liable for misstatements not specifically attributed to him, where he was "primarily responsible" for communications with investors and analysts and was "involved in drafting, producing, reviewing and/or disseminating of the false and misleading statements."  Scholastic, 252 F.3d at 75-76.  The Second Circuit similarly did not hew to the "bright line" in Suez Equity Investors when it imposed liability on a defendant who misled investors by passing on a report that he knew to be forged although he himself did not write the report.  See 250 F.3d at 101.

Several district courts in the Second Circuit have noted the tension between Scholastic and Wright.  See, e.g., In re Alstom S.A., 406 F. Supp. 2d 433, 465-66 (S.D.N.Y. 2005) (noting tension); In re Global Crossing, 322 F. Supp. 2d at 331 ("While Scholastic might indicate some relaxation of Wright' s requirement ... it does not provide any guidance as to when a statement not attributed to a defendant might cross the line into a primary violation.").  The Alstom court, however, believed that the cases were "consistent in that neither jeopardizes Central Bank' s

-21-

FOR PUBLICATION

limitation on aider and abettor liability, as the defendant CFO in Scholastic was alleged to have

made misstatements and thus played a role exceeding that of an aider and abettor."  406 F. Supp.

2d at 466;  see also In re Global Crossing, 322 F. Supp. 2d at 334 (allowing primary liability to

attach to auditor defendant where allegations that the defendant "prepared" or "helped create" the

false statements issued by company "place its involvement well beyond the realm of 'aiding and

abetting' liability precluded by Central Bank" ).  The Alstom court denied the motion to dismiss

the primary liability claim because the defendant's involvement in the fraud, as the source of the

false information, extended beyond the realm of aiding and abetting.  See Alstom, 406 F. Supp.

2d at 466.  The court further justified the result by noting that the "Wright doctrine requiring

attribution may be relaxed in the case of unattributed statements of a corporate insider."  Id. at

466 n.29.  The court reasoned that:

> Such a result is not necessarily at odds with Wright, as a corporate insider is
> distinguishable from an outside auditor. ... Scholastic can be read as comporting
> with Wright's reliance requirement because it is reasonable to infer that an
> investor, when evaluating the financial statements of a company, at least
> implicitly relies on the officers of that company, who are generally understood to
> be responsible for day-to-day corporate affairs including preparation of statements
> for public disclosure.

Id.; see also In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455, 472-73 (S.D.N.Y. 2004)

(characterizing the seemingly dissonant Second Circuit opinions as reflecting a trend by that

circuit to "dismiss[] claims against outside officials who provided necessary services to the

fraudsters, but allow[] claims to proceed against inside actors who actively participated or

orchestrated the fraudulent scheme alleged, even if they did not personally make the false

statements").  The court observed in another opinion that "strict requirement of public attribution

FOR PUBLICATION

would allow those primarily responsible for making false statements to avoid liability by remaining anonymous, and thus 'would place a premium on concealment and subterfuge rather than on compliance with the federal securities laws.'" Global Crossing, 322 F. Supp. 2d at 333.

These cases indicate that the "bright line" test, as applied by the Second Circuit and the district courts of that circuit, is not as rigid as it seems.[8]  There is wiggle room in determining whether a culpable actor has "made" the misstatement.  Wright itself recognized that "[t]here is no requirement that the alleged violator directly communicate misrepresentations to [investors] for primary liability to attach."  152 F.3d at 175.  There is also logic in the various courts' reasoning that the attribution requirement should be loosely applied against corporate insiders or not applied at all in SEC enforcement actions.

Ultimately, however, none of this discussion compels this Court to depart from the law of the case as decisions from other circuits are not controlling upon it.  The SEC has acknowledged that Aversano, Dorn, and Carter did not draft or sign any of Lucent's financial reports filed with the SEC and that these reports did not contain any statements attributed to them. (SEC Opp'n Br. to Aversano at 3; SEC Opp'n Br. to Dorn at 3; SEC Opp'n Br. to Carter/Hayes-Bullock at 25.) Leaving aside the SEC's explicit concession at oral argument that primary liability cannot attach to defendants under the "bright line" standard as adopted by this Court in Lucent I, these factual

---

[8]  In Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 155 (2d Cir. 2007), the Second Circuit renewed its endorsement of Wright's holding that only an articulated statement of attribution to a secondary actor is sufficient to impose primary liability.  However, Lattanzio did not discuss nor attempt to reconcile Scholastic and the cases following it.

FOR PUBLICATION

concessions are sufficient to entitle defendants to summary judgment on the primary liability

claims under Rule 10b-5(b).

Even if the Court were to adopt a more flexible "bright line" test, the result would not be

different.  Primary liability under this standard would exist if the defendant "was sufficiently

responsible for the statement – in effect, *caused* the statement to be made – and knew or had

reason to know that the statement would be disseminated to investors." S.E.C. v. KPMG, 412 F.

Supp. 2d at 375 (emphasis added); S.E.C. v. Collins & Aikman, 524 F. Supp. 2d at 490; accord

S.E.C. v. Wolfson, 539 F.3d 1249, 1261 (10th Cir. 2008) ("The relevant question is only whether

he can fairly be said to have caused [the entity] to make the relevant statements ....") (citing

McConville v. S.E.C., 465 F.3d 780, 787 (7th Cir. 2006)).  In analyzing whether a particular

defendant should be deemed to have made the misstatements, the focus of the inquiry is on how

extensively the defendant was involved in creating and issuing public financial statements.  The

Wolfson defendant was found to be primarily liable because he had drafted the misleading

statements that were publicly filed.  See 539 F. 3d at 1261.  Similarly, the court found primary

liability appropriate against engagement partners in KPMG because the engagement partners had

"ultimate authority to determine whether an audit opinion should be issued." KPMG, 412 F.

Supp. 2d at 375-76; see also S.E.C. v. Treadway, 354 F. Supp. 2d 311, 316-17 (S.D.N.Y. 2005)

(corporate officer with authority over the content of portions in company's prospectuses found to

be misleading).  The KPMG court, however, dismissed the primary liability claim against a

concurring review partner, even though he had approved the issuance of the audit opinions,

**FOR PUBLICATION**

because he had a more limited scope of duties and could not be said to have been the author of any misstatements.  See 412 F. Supp. 2d at 376.

The SEC argues that each defendant is primarily liable because their actions created the misstatement and their silence in the face of such misstatement constituted an actionable omission.  It points to the fact that Aversano and Dorn both made oral assurances to the distributors and hid these facts from the accounting department.  It also cites a management representation letter that Aversano signed for the fourth quarter of 2000 acknowledging her responsibility "for fair presentation in the financial statements" in accordance with GAAP while falsely attesting that she knew of no oral assurances that created future obligations for Lucent. Dorn similarly made a false written representation to Lucent's Chief Accountant.  As to Carter, the SEC cites his role in authorizing the verbal agreement regarding the retroactive pricing of VPP and his failure to disclose the existence of such an agreement to the appropriate Lucent CFO structure.  Like Aversano, Carter executed the same management letter for third quarter of 2000 and falsely represented that there was nothing to cause any accounting concerns for his unit. When questioned by Lucent's Chief Accountant about the transaction, he again failed to tell the truth.

Considering all of these facts, such allegations are insufficient to hold the defendants primarily liable even under the relaxed "bright line" standard.  The above facts simply depict a chain of causation leading to the making of a misstatement.  It does not show that the defendants were integrally involved in drafting of that misstatement or that they were ultimately responsible for recognizing revenues at Lucent, the province of the Chief Accountant and the senior officers

FOR PUBLICATION

of Lucent.  Although defendants had responsibilities that <u>affected</u> the task of recognizing

revenues, they did not have ultimate nor penultimate authority in that task.  The SEC does not

dispute that senior executives of Lucent scrutinized revenue recognition decisions

and had final authority to recognize revenues for a given transaction.  (Dorn Facts ¶ 189;

Aversano Facts ¶¶ 10-12.[9])  Defendants' role in this case simply bears no resemblance to the

responsibilities and conduct of the various defendants in the cases advanced by the SEC.  Thus,

defendants are entitled to summary judgment on the primary liability claim under Rule 10b-5(b).

      D.     *Defendants' Liability for Participation in a Fraudulent Scheme*

---

[9]    The SEC disputes paragraph 12 in Aversano's Statement of Undisputed Facts which states that "Lucent's Controller, CEO and CFO had ultimate responsibility for public reporting of Lucent's revenue."  The SEC contends that the deposition testimony which this fact relies on does not support it because the deponent, an outside auditor for Lucent, answered, "to say he has ultimate responsibility, I'm not sure what that means."  Aversano responded that the SEC misconstrued the testimony as the complete question and response was:

> Q: Did the person in the corporate controller position at Lucent during fiscal year 2000 have the ultimate responsibility for the external reporting of Lucent's revenue?
> A: He, [the controller] as well as the chief financial officer and the CEO, would have the responsibility for that.  So to say he had the ultimate responsibility, I'm not sure what that means.

(Aversano Facts, Exh. 4 (Dziengel Dep. Tr.) at 38:21-39:8).  Aversano argues that the response clarified that three individuals, rather than one, had the responsibility for Lucent's external reporting whereas the SEC focuses only on the deponent's lack of understanding as to what "ultimate responsibility" meant.  Although the Court must construe all facts in favor of the non-movant, the Court need not indulge in implausible interpretations urged by that party.  In viewing the question and the response as a whole, the SEC's challenge does not create a genuine issue of fact: the deponent clearly meant to indicate that the controller, the CEO and the chief financial officer shared the ultimate responsibility for external reporting and was only professing a lack of understanding as to the question as it was put to him, whether the controller, by himself, had the ultimate responsibility.

FOR PUBLICATION

In addition to liability for its statements in Lucent's financial reports, the SEC urges that the defendants are primarily liable for their deceptive conduct under Rule 10b-5(a) and (c). As the Supreme Court noted, "[c]onduct itself can be deceptive;" such that liability under Section 10(b) or Rule 10b-5 could be sustained without "a specific oral or written statement." Stoneridge, 128 S. Ct. at 769. Nevertheless, as one court noted, there is considerable "tension between the proposition that mere participation in a fraudulent scheme is sufficient to incur liability under Section 10(b) and the Supreme Court's earlier admonition in Central Bank that 'the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative [or deceptive] act.... We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive.'" Collins & Aikman, 524 F. Supp. 2d at 485 (quoting Central Bank, 511 U.S. at 177). If the scope of "scheme liability" is too broad, there is a risk that it becomes "a back door into liability for those who help others to make a false statement or omission," thus reviving aiding and abetting liability in private actions. In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 503 (S.D.N.Y. 2005).

Defendants complain that the SEC is recasting its misrepresentation claim as a "scheme" claim to avoid the limitations on primary liability imposed by the "bright line" test. Defendants assert that where a Section 10(b) claim is based on alleged misstatements in a company's public filings, as here, the defendant's deceptive scheme or course of conduct must "go beyond misrepresentations" in order to maintain a "scheme" claim under Rule 10b-5(a) or (c), in addition to a "misrepresentation" claim under Rule 10b-5(b). (Aversano Reply at 12.) Defendants rely on In re Royal Dutch/Shell Transp., No. 04-374, 2006 WL 2355402, at *8 (D.N.J. Aug. 14, 2006)

FOR PUBLICATION

which in turn relied on In re Alstom, S.A., 406 F. Supp. 2d 433 (S.D.N.Y. 2005).

In Royal Dutch, the plaintiffs alleged that defendant KPMG was primarily liable for its "active" participation in overstating the proved oil and natural gas reserves of its client, Royal Dutch Petroleum Company. See 2006 WL 2355402 at *2. The principal allegations against KPMG were that it had unfettered access to documents and employees of Royal Dutch and knew or recklessly disregarded that its client were improperly reclassifying reserves as proved in violation of the SEC guidelines. See id. at *6. The court first concluded that plaintiffs had failed to state a claim against KPMG under Rule 10b-5(b) because KPMG had not made the material misstatement or omission. See id. at *7. The court next dismissed the "scheme" claim under Rule 10b-5(a) and (c) because any deceptiveness alleged against KPMG resulted from the issuance of unqualified audit opinions and reports that violated accounting standards which was "nothing more tha[n] a misrepresentation claim." See id. at *10. The court also observed that the allegations regarding KPMG's business practices which the plaintiffs alleged "enhanced and facilitated" the fraudulent misrepresentations smacked of aiding and abetting liability. See id.

Royal Dutch does not fully explain what it means for a scheme to defraud to "go beyond misrepresentations." It seems safe to assume, however, that allegations of a scheme based on the same misstatements that would form the basis of a misrepresentation claim under Rule 10b-5(b) and nothing more do not go beyond misrepresentations. See Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 177 (2d Cir. 2005) (rejecting scheme liability claims where "the sole basis for such claims is alleged misrepresentations or omissions"). In contrast, defendants' reading of these cases appears much broader: they argue that a defendant cannot be liable if his course of conduct

-28-

**FOR PUBLICATION**

was merely participation in a scheme whose purpose was to make a misstatement.  There is no

support for such a reading and such a rule would be nonsensical.  According to defendants, the

architects of a fraudulent scheme, whose deception is communicated to the investing markets

through an unattributed misstatement in a public filing, would be immune from liability.  A

corollary to this is that only deceptive conduct which is not communicated by way of public

statements is reachable by Rule 10b-5(a) and (c).  But deception, at a minimum, has to involve an

act that gives the victims a false impression.  See United States v. Finnerty, 533 F.3d 143, 148

(2d Cir. 2008).  If the investing public has no knowledge that an issuer committed an act because

the entity has not conveyed any information about that act (nor withheld pertinent information

that would make a public statement about that act misleading), there has been no deception

because no false impression was created.  In addition to the logical fallacy, defendants' reading is

flatly contradicted by In re Global Crossing which made clear that while a defendant who has not

made the fraudulent statements cannot be held liable for the *statements*, that same defendant may

be held liable for the fraudulent *scheme* behind the misstatements.  See Global Crossing, 322 F.

Supp. 2d at 337 n.17.

Defendants are on firmer ground in urging another limitation to scheme liability, that the

conduct at issue must involve "sham" or "inherently deceptive" transactions to sustain a claim

under Rule 10b-5(a) or (c).  They distinguish cases cited by the SEC as involving factually

dissimilar and seemingly more egregious conduct than the conduct here, such as illegal late

trading or structuring round-trip transactions and fabricating documents to create "phantom"

revenue.  See, e.g., S.E.C. v. Simpson Capital Mgmt., Inc., 586 F. Supp. 2d 196, 205 (S.D.N.Y.

**FOR PUBLICATION**

2008) (allowing scheme claim where defendants were alleged to have engaged in a scheme to

"late trade" mutual funds which is itself illegal; defendants submitted trade orders before 4:00

PM but only authorized the brokers to execute the trade upon a subsequent phone call); Collins &

Aikman Corp., 524 F. Supp. 2d 477, 480-81 (S.D.N.Y. 2007) (allowing scheme claim where

defendants were alleged to have perpetrated "round-trip transactions" supported by fabricated

documentation); Global Crossing, 322 F. Supp. 2d at 336-337 (denying motion to dismiss

scheme claim where it was alleged that defendant "masterminded" sham swap transactions used

to circumvent GAAP and inflate revenues).  While these cases found the conduct at issue was

enough of a "sham" to allow the scheme claim to proceed, they did not elaborate on how to

distinguish inherently deceptive conduct from that which is not.  By contrast, the court in

Parmalat directly took on this task.  See 376 F. Supp. 2d at 505.  There, Citibank made loans to

Parmalat which were disguised as equity investments on Parmalat's financial statements;

Citibank allegedly knew that the loans would be misrepresented as equity by Parmalat.  See id. at

482.  The Parmalat court dismissed the scheme claim based on these allegations because "any

deceptiveness resulted from the manner in which Parmalat or its auditors described the

transactions on Parmalat's balance sheets"  Id. at 505.  Conversely, the Parmalat court allowed

the scheme claim to go forward against Citibank for its part in securitizing worthless invoices

because the transactions themselves, which depended on a fiction that the invoices had value,

were inherently deceptive.  See id. at 504; see also Alstom, 406 F. Supp. 2d at 476-77

(dismissing scheme liability claims where underlying conduct, intentional underbidding of

contract, was held not to be inherently deceptive).

FOR PUBLICATION

Here, giving oral assurances of rights of return or pricing concessions in connection with the sales, in and of itself, was not inherently deceptive. The sales at issue were legitimate business transactions and the customers purchased the product from Lucent with every intention of using it or selling it to end customers. The alleged "deception" in this case arose from the failure to disclose the 'real terms' of the deal," which is "nothing more than a reiteration of the misrepresentations and omissions that underlie plaintiffs [sic] disclosure claim." TCS Capital Mgmt., LLC v. Apax Partners, L.P., No. 06-cv-13447, 2008 WL 650385, *22 (S.D.N.Y. Mar. 7, 2008) (rejecting plaintiff's Rule 10b-5(a) and (c) claim). "Subsection (a) and (c) may only be used to state a claim against a defendant for the underlying deceptive devices or frauds themselves, and not as a short cut to circumvent Central Bank's limitations on liability for a secondary actor's involvement in making misleading statements." Global Crossing, 322 F. Supp. 2d at 337 n.17. Although there is no clear Third Circuit precedent on the standard for scheme liability, the Court finds the cases discussed earlier from the Southern District of New York instructive. The factual record of this case does not support the SEC's alternative theory of liability and cannot breathe new life into the defunct primary liability claims against Aversano, Carter, and Dorn. The primary liability claims under Rule 10b-5(a) and (c) are dismissed against all defendants.

## II.    Aiding and Abetting Liability Under Section 10(b)

In addition to primary violations of Section 10(b), the SEC has alleged aiding and abetting violations of Section 10(b) and Rule 10b-5 against all defendants. Liability for aiding and abetting a securities violation requires the SEC to establish: (1) an underlying securities

FOR PUBLICATION

violation; (2) that the alleged aider-abettor had knowledge of the wrongful act and (3) that the

alleged aider-abettor knowingly and substantially participated in the wrongdoing.  See Monsen v.

Consol. Dressed Beef Co., 579 F.2d 793, 799 (3d Cir.1978); S.E.C. v. Lucent Technologies, Inc.,

2005 WL 1206841, *7 (D.N.J. May 20, 2005) ("Lucent II").

     A.     *Scienter Standard for Aiding and Abetting Liability*

     The parties intensely dispute whether the scienter standard for the aiding and abetting

claims encompasses recklessness.  The SEC asserts that it does while defendants contend that

only actual knowledge will suffice.

     After the Supreme Court held in Central Bank that the Exchange Act did not authorize

private claims for aiding and abetting Section 10(b) violations, there was uncertainty on whether

the SEC could bring such actions.  Cf. 511 U.S. at 200 (Stevens, J., dissenting) (stating that

majority leaves little doubt that the SEC is not permitted to pursue aiders and abettors).  In

response, Congress enacted Section 20(e) of the Exchange Act to codify the SEC's authority to

bring aiding and abetting claims.  See 15 U.S.C. § 78t(e).  Section 20(e) provides that "any

person that knowingly provides substantial assistance to another person in violation of a

provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed

to be in violation of such provision to the same extent as the person to whom such assistance is

provided."  Id.

     Section 20(e) was enacted as part of the Private Securities Litigation Reform Act of 1999.

In that same act, Congress expressly defined "knowingly" as actual knowledge.  See 15 U.S.C. §

78u-4(f)(10)(A); 15 U.S.C. §§ 77z-2(c)(1)(B)(i), 78u-5(c)(1)(B)(i).  The SEC contends that

FOR PUBLICATION

because Congress explicitly defined "knowingly" in certain subsections but not for the subsection

governing the SEC's right to bring aiding and abetting claims, Congress made a conscious choice

not to require actual knowledge in SEC enforcement actions.  The Court disagrees.  That

"knowingly" was defined as actual knowledge in the very same bill that contained Section 20(e)

undermines the SEC's position.  "[I]dentical words used in different parts of the same act are

intended to have the same meaning."  Gustafson v. Alloyd Co., 513 U.S. 561, 570, 115 S. Ct.

1061 (1995) (citation omitted); see also Kapral v. United States, 166 F.3d 565, 575 (3d Cir.

1999).  Moreover, the legislative history of Section 20(e) in which the Senate rejected a proposed

amendment to Section 20(e) that would have added recklessness to the standard supports the

conclusion that Congress intended to require actual knowledge.  See KPMG, 412 F. Supp. 2d at

383 (quoting floor debate over the language of amendment which recognized Section 20(e)

"effectively eliminate[ed] the ability of the [SEC] to proceed against reckless professional

assisters."); see also S.E.C. v. Pasternak, 561 F. Supp. 2d 459, 501 (D.N.J. 2008).

 In reviewing the KPMG opinion, it is apparent that the SEC offers the same arguments

here that the KPMG court found unpersuasive.  That court rejected the SEC's contention that

Section 20(e) was intended to codify the law with respect to aiding and abetting claims in SEC

enforcement before Central Bank, the very contention that the SEC raises here, because there was

no uniformity on the issue of what constituted the requisite scienter for aiding and abetting

liability.  See KPMG, 412 F. Supp. 2d at 383 (citations omitted).  This Court too rejects the

SEC's argument.  The plain language of Section 20(e), its legislative history, and the cogent

analysis in KPMG provide ample support for the conclusion that Congress intended to require

**FOR PUBLICATION**

actual knowledge as the scienter standard for aiding and abetting liability.

In addition to actual knowledge, the SEC must also show that the aider-abettor substantially assisted in the underlying fraud. To determine whether an aider-abettor's conduct is sufficient to constitute substantial assistance, the Third Circuit has looked to the Restatement of Torts. See Monsen, 579 F.2d at 800. The Restatement instructs the trier of fact to consider the following factors: (1) the amount of assistance given by the defendant; (2) the defendant's presence or absence at the time of the tort; (3) the defendant's relation to the other person; and (4) the defendant's state of mind. See id. (citing Rest. Torts, § 876 (1937)). The Monsen court has further held that inaction, without conscious intent to assist in the perpetration of a wrongful act, cannot predicate liability. See id. With these principles in mind, the Court now addresses each defendant's arguments regarding aiding and abetting liability.

      *B.*     *Dorn*

Dorn first claims that she is entitled to summary judgment because she lacked revenue recognition training and expertise. This claim is flawed. The securities laws do not require that a defendant know the precise accounting treatment that would have been applied before she can have the requisite scienter; the SEC need only demonstrate that Dorn knew of facts that contradicted the substance of the reported accounting. Cf. In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 567-68 (S.D.N.Y. 2004).

Here, there is ample evidence that Dorn knew enough about accounting rules to know that it was improper not to disclose the side deals she made. Dorn herself admits that she had a general awareness of revenue recognition principles and that she had a responsibility to make

-34-

**FOR PUBLICATION**

sure that the Corporate Financial Organization ("CFO structure") was apprised of how business in her group was conducted. (Dorn's Response to SEC Facts ¶ 17.) Although the accounting for the distributor transactions may have been very complex and required the application of nuanced judgment, as Dorn claims, the SEC has put forth evidence that Dorn knew that giving oral assurances outside of the terms of the written contacts, such as granting a right of return, could impact revenue recognition. Lucent's Chief Account testified that he had discussions with Dorn relating to rights of return and he concluded from that discussion that Dorn fully understood that oral assurances could affect revenue recognition. (SEC Facts, Exh. 19 at 822:13-823:18.) Furthermore, Dorn demonstrated her knowledge of revenue recognition in September 2000 when she added handwritten comments to a draft letter discussing a proposal for business with Anixter. Dorn crossed out a specific sentence in the letter that discussed Lucent working with Anixter to sell product to other potential customers and wrote: "Prohibits revenue recognition." (SEC Facts ¶ 17). Dorn further commented that the proposal "could be a great business arrangement ... but we cannot book the revenue ... may be revenue for the future." (Id.) Although Dorn asserts that these were mere comments by others that she jotted on her copy of the draft letter, the assertion itself presents a dispute of material fact to be evaluated by the fact finder.

Contrary to Dorn's arguments, her conduct is dissimilar to that found insufficient for liability in S.E.C. v. Todd, No. 03-2230, 2006 WL 1564892 (S.D. Cal. May 30, 2006) and S.E.C. v. Coffman, No. 06-cv-088, 2007 WL 2412808 (D. Colo. Aug. 21, 2007). In Todd, the court refused to draw an inference of scienter because there was simply no evidence that the defendant knew that there were any accounting improprieties with a transaction. See Todd, 2006 U.S. Dist.

FOR PUBLICATION

Lexis 411922006 WL 1564892 at *7.  Likewise, in finding in favor of the defendant after a bench trial, the Coffman court noted that there was no evidence that anyone suggested to the defendant that the assets at issue were impaired.  See Coffman, 2007 WL 2412808 at *14.  Here, by contrast, the evidence suggests that although Dorn knew that she could not give oral assurances without informing the appropriate Lucent finance personnel she did so anyway.  Accordingly, the Court concludes that there are genuine issues for trial as to whether Dorn had sufficient accounting knowledge to recognize that her conduct was wrong.

        Dorn next says that the SEC's evidence of scienter is insufficient because there is no evidence that she had any motive to commit fraud.  She points out that she did not realize any direct benefit from her alleged conduct and she in fact lost money due to the significant decline in value of Lucent's stock during the relevant period.  Motive is not an element of aiding and abetting claim.  Rather, motive and opportunity for committing fraud is one of two ways to plead scienter under Third Circuit law.  See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1422 (3d Cir. 1997) (a plaintiff "must **either** (1) identify circumstances indicating conscious or reckless behavior by defendants **or** (2) allege facts showing both a motive and a clear opportunity for committing the fraud.") (emphasis supplied).  The SEC has satisfactorily demonstrated the existence of a question of material fact by presenting evidence of Dorn's conduct and omissions, from which a jury could infer fraudulent intent.[10]

_____

        [10]  Dorn also asserts that she acted in good faith.  Section 20(a) expressly permits an affirmative defense of good faith for controlling person liability.  See 15 U.S.C. § 78t(a).  Controlling person liability is not at issue in this action.  Even if it were, Dorn's naked assertions of good faith are insufficient to establish good faith as a matter of law.

FOR PUBLICATION

Dorn also says that she did not substantially assist in the commission of fraud because Lucent's CFO structure "was aware of all necessary information to make appropriate revenue recognition decisions on the transactions at issue."  (Dorn's Br. at 33.)  Specifically, Dorn contends that the accountants had sufficient knowledge of the significant risk of returns, carrying charges, and "post-sales support," that is, assisting the distributors to find customers and swapping and reconfiguring products, as to make Dorn's purported failure to disclose these terms irrelevant to Lucent's revenue recognitions decisions.  The SEC counters that Dorn does not (because she cannot) claim that she made Lucent's CFO structure aware of the oral assurances she made and that her failure to do so is the material point, not whether the accountants knew generally of the risk of returns, the practice of granting post-sales support and including carrying charges in distributor transactions.  Because triable issues of material fact exist over whether Lucent's finance organization was aware of the specific oral assurances that Dorn made to distributors, summary judgment on this ground is inappropriate.

Dorn's final argument is that her actions were not the proximate cause of Lucent's misstatements.  She asserts that the misstatements were due to Lucent's deficient internal controls and procedures, its decentralized structure, and its failure to obtain an understanding of the indirect channels' business.  Dorn points to the reports prepared by Lucent's outside accountants, Price Waterhouse Coopers, which warned that Lucent's internal controls were weak and that the decentralized structure of its accounting operations may result in improper recognition of revenues.  However, as the SEC argues, the gravamen of the claims against Dorn is that she kept secret the verbal agreements she made, thus circumventing the internal controls.

FOR PUBLICATION

The SEC's expert has opined that "even if material weaknesses [in internal controls] existed at Lucent in 2000, ... these weaknesses would not have precluded properly reporting revenue from the Distributor Transactions in accordance with GAAP."  (SEC Facts -  Aversano/Dorn ¶ 152.) Genuine issues of fact remain as to whether Dorn's actions proximately caused Lucent's misstatements.  Based on this factual dispute and the others described above, summary judgment on Dorn's aiding and abetting liability under Section 10(b) is denied.

   C.   Carter

   In addition to his argument that there was no misstatement with respect to the recording of revenues on the sale of the switches to AWS, addressed in Part I.B. above, Carter advances several other arguments to obtain summary judgment as to all counts.  Carter first argues that because Lucent CEO Rich McGinn sent an e-mail to AWS CEO John Zeglis on June 27, 2000 explicitly stating that Lucent would bill AWS for the switches at issue under the existing GPA contract and provided that any credits to be given to AWS would follow once the VPP contract was executed, he is absolved of liability.  According to Carter, this e-mail made clear, irrespective of what may have been promised earlier with regard to retroactivity of VPP pricing, the four switches would be billed under the existing GPA, making revenue recognition during the quarter ending on June 30, 2000 proper.  The SEC answers that Mr. McGinn's e-mail proves nothing because first, there is evidence that the proposal made in McGinn's e-mail actually originated from Carter and hence did not break the causal chain and second, AWS did not agree to McGinn's proposal.  (SEC Facts ¶ 78.)  Mr. McGinn himself testified that he did not draft the e-mail and merely sent it at the request of Pat Russo who, the SEC says, was in turn asked to do

FOR PUBLICATION

so by Carter.  (Id. Exh. 15.)  In reply, Carter attacks the SEC's argument as unsupported.  Carter

claims that he had no part in conceiving of or drafting the e-mail.  This, however, misses the

mark because the SEC's argument is not that Carter had drafted or conceived of the e-mail but

that he had enlisted the help of his superior, Pat Russo, who in turn asked Mr. McGinn to get

involved.  Whether the help came in the form of an e-mail is irrelevant.  The SEC's version of

the events is supported by the 2002 investigative testimony of Michelle Hayes-Bullock, who

recalled Carter saying these facts.  Carter objects to Hayes-Bullock's testimony on the ground

that it is speculative because she did not see the e-mail at the time.  This again misses the

material point of the SEC's claim that Carter was behind the proposal contained in McGinn's e-

mail.[11]  More substantively, Carter argues that AWS did agree to the proposal because it

promptly sent purchase orders to Lucent for the four switches and one of Lucent's negotiators for

the VPP contract understood AWS's conduct to mean that it had agreed to McGinn's proposal to

bill the switches under conventional pricing.  This, according to Carter, eviscerated the alleged

earlier verbal promise that VPP would be made retroactive to cover the switches.  The SEC

---

[11]  Following the oral argument in this matter, Carter wrote to the Court fortifying his objection to the SEC's use of Hayes-Bullock's investigative testimony as insufficient to raise a genuine issue of material fact and as inadmissible hearsay.  The Court thinks otherwise.  Carter argues that Hayes-Bullock's testimony does not support the SEC's version of events because her testimony was limited to whether Carter had asked Russo to help on the VPP contract, not specifically on the switches.  However, the SEC's contention that Carter had originated the proposal regarding the switches is a reasonable inference from Hayes-Bullock's testimony and McGinn's testimony that he received the e-mail concerning the specific switches from Russo.  As to whether Hayes-Bullock's testimony is inadmissible hearsay, the Court is not precluded from considering it at this stage because the testimony may be admissible at trial as past recollection recorded if Hayes-Bullock cannot recall the substance of her earlier testimony at trial.  See Fed. R. Evid. 803(5).  The Court expresses no opinion at this time on whether her testimony may be alternatively admissible as non-hearsay, co-conspirator statement.

FOR PUBLICATION

disputes this account, contending that it was both Lucent and AWS's understanding that AWS would provide purchase order at the end of Lucent's quarter ending June 30, 2000 and that Lucent would invoice the order under conventional pricing but, in conformity with the oral understanding, that Lucent would provide a credit for the invoiced amount and that AWS would ultimately pay the VPP price for the switches.  As the conflicting claims make clear, this is a factual dispute which the Court may not resolve by summary judgment.

Carter's next argument is that he had no scienter to aid and abet Lucent to improperly account for the sale of the switches to AWS.  Carter notes that there is no evidence that he knew the existence of the four switches, much less that he "instructed his subordinates to obtain a purchase order" in order to recognize revenue.  According to Carter, the SEC's entire case concerning his alleged involvement in the scheme to inflate revenues for Lucent's third quarter, ending on June 30, 2000, is a single instruction to his sales team to "clean up SNIPS"[12] at the end of June.  Indeed, the SEC presents no evidence that Carter "instructed" his subordinates to obtain a purchase order but instead argues that the order to obtain purchase orders is inherent in the directive to "clean up SNIPS."  (SEC's Response to Carter Facts ¶ 143.)  In addition, Carter notes that he only authorized Vanderstroom to offer AWS the April 1 start date for the VPP contract as part of the comprehensive proposal that Vanderstroom was preparing.  In Carter's mind, when AWS rejected Lucent's proposal, the entire proposal was rejected, including the offer to make the VPP contract retroactive to April 1, 2000.  Carter also claims that because

---

[12]   SNIPS refers to a list of equipment that had been "shipped, but not yet invoiced" by Lucent to the customer.

FOR PUBLICATION

Lucent's Chief Accountant, Chief Financial Officer, outside auditor (PWC), and outside counsel

(Cravath, Swaine & Moore) all agreed that the accounting for the switches in Lucent's third

quarter was correct, he could not have had actual knowledge that he was aiding and abetting a

scheme to improperly book revenues.[13]

The SEC assails this account as self-serving statements by Carter and urges that there are

enough disputes of fact to send the issue of Carter's scienter to the jury.  The SEC first notes that

as a sales executive, Carter was familiar with revenue recognition principles and knew that oral

commitments can have an impact on revenue.  In spite of this knowledge, the SEC alleges, Carter

authorized Vanderstroom in March 2000 to offer a concession to AWS that Lucent would make

the pricing under the VPP retroactive to April 1, 2000.  Vanderstroom testified that the

concession regarding retroactivity was offered to convince AWS from canceling $250 million in

orders for switches and that everybody, including Carter, was aware of this.  (SEC Facts -

Carter/Hayes-Bullock, Exh. 20 at 193:6-194:15.)  Deposition testimony of all four negotiators of

the VPP contract indicates that they all believed that pricing under the VPP would be made

retroactive to April 1, 2000.  Although the SEC does not specifically refute Carter's contention

that the March 2000 conversation was the only communication that Carter had with respect to the

verbal agreement and that when the proposal was rejected by AWS the next day he had assumed

the entire proposal was rejected, the SEC asserts that there was no need to discuss the April 1,

---

[13]  Carter also places much significance on the fact that the SEC has not required Lucent
to restate its third quarter financials and argues that the SEC's inaction provides further
persuasive support that Lucent's recognition of revenue was correct.  As amply discussed at oral
argument, (Hr'g Tr. 68:2-73:11, Mar. 31, 2009) the failure of the SEC to require restatement
proves nothing.

**FOR PUBLICATION**

2000 effective date because it was "cast in stone" and never changed.

With respect to the specific switches at issue and the alleged improper recording of revenue for the switches, the evidence is murky on whether Carter knew he was referring to the switches at issue when he ordered his subordinates to "clean up the SNIPS." The SEC does not effectively dispute that Carter was neither involved nor aware that the four switches were ordered and shipped. In addition, while the SEC points to Vanderstroom's testimony that he told Carter about the four switches in connection to Carter's general directive to his subordinates to "clean up the SNIPs", the cited testimony is ambiguous and is clarified by later testimony that Vanderstroom had not specifically discussed the four switches at issue with Carter. The SEC asserts that even if Carter did not instruct anyone to obtain purchase orders for the switches Carter cannot prevail on summary judgment because he willfully decided not to disclose the verbal agreement regarding VPP retroactivity. Carter counters that the SEC is asking the Court to infer that just because Carter authorized a verbal agreement regarding retroactivity in March 2000, he would have known that his directive to "clean up the SNIPS" in June 2000 meant that he was ordering his subordinates to improperly recognize revenues on the switches. The Court agrees that this is a too far-reaching inference and insufficient to raise a genuine issue of fact on whether Carter had actual knowledge about the switches and the attendant revenue recognition issues.

The SEC also claims that the allegedly misleading letters Carter signed in September, after the VPP contract was consummated and the third quarter 10-Q filed, are further proof of Carter's scienter. This Court had previously ruled in the April 2005 opinion in regard to these

-42-

FOR PUBLICATION

very letters, "common sense dictates that actions taken after the fraud occurred can be

circumstantial evidence that the defendant acted with the requisite state of mind."  Lucent I, 363

F. Supp. 2d at 717.  However, the Court also wrote with respect to Carter's co-defendant, "[i]f

Hayes-Bullock did not know about the side agreement before the revenue was recognized then

the SEC could not establish the second element of the aiding and abetting claim [knowledge]."

Id. at 725-26.  Therefore, the letters can only be relevant evidence if they shed light on "whether

defendant[] knew at the time of the alleged misleading statements that fraud would ensue."

Derobbio v. Harvest Communities of Sioux City, Inc., No. 01-1120, 2002 WL 31947203, *4

(D.N.J. Oct. 30, 2002).  Although the letter concerns whether the switches, the revenues of which

were recorded in the third quarter, were properly accounted for, it does not, on its face, reveal

what Carter knew at the time of the misstatement.  The signing of this letter in the absence of

other probative facts of Carter's contemporaneous knowledge does not raise a genuine issue of

material fact.

        The most persuasive evidence in favor of granting summary judgment to Carter is that

Lucent's management, its outside auditor, and outside counsel approved the accounting of the

switches.  The Third Circuit has held that an auditor's endorsement of another auditor's opinion

is highly probative of the competence of such opinion and undermines any suggestion that the

defendant auditor acted with scienter as to any misstatements contained in such opinion.  See In

re IKON Office Solutions, Inc., 277 F.3d 658, 669 (3d Cir. 2002).  Although the auditors'

approval of the accounting at issue here does not establish as a matter of law that the accounting

was proper, it does seriously undermine the suggestion that Carter knowingly aided and abetted a

**FOR PUBLICATION**

scheme to misstate Lucent's financials.

The anemic disputes of fact raised by the SEC are not sufficient to send the issue of

Carter's scienter to a jury.  Summary judgment is appropriate when the factual issues are not

genuine or material.  Such is the case here.  Viewed in totality, the record lacks facts that could

plausibly lead the jury to conclude that Carter had knowledge of the underlying fraud.  The Court

grants Carter's motion for summary judgment on the aiding and abetting liability claim.

      D.     *Hayes-Bullock*

Hayes-Bullock contends that she cannot be held liable for aiding and abetting fraud

because she never knew that Lucent's third quarter financials were misstated and did not provide

substantial assistance in furtherance of the fraud.  Hayes-Bullock notes that she was a middle

finance manager with at least three levels of management above her.  She was not responsible for

preparing or signing Lucent's publicly reported financial statements or supervising Lucent's

internal accounting and audit functions.  Hayes-Bullock concedes that she knew that there was a

discussion between Lucent and AWS about VPP pricing going into effect in April 2000 while the

VPP contract was being negotiated and recognized the problems attendant in such an

arrangement from an accounting standpoint.  However, she claims that she expressed these

concerns to her subordinate who then relayed them to the VPP negotiators, Vanderstroom and

Diliani.  Hayes-Bullock also notes that in June 2000 her superiors had determined that because

no VPP contract had been signed as of the end of the third quarter, the switches could be

invoiced under the GPA which was then in effect.  She places particular emphasis on Lucent's

Chief Accountant's testimony that he did not believe that Hayes-Bullock intentionally misled

FOR PUBLICATION

him in conversations after the third quarter financials were filed.  Like Carter, Hayes-Bullock

also argues that because Lucent's senior management and an internal investigation led by

independent counsel and accountants concluded that the accounting for the switches was correct,

no reasonable jury could find that she possessed actual knowledge of the primary violation of the

securities laws.

The SEC asserts that there are sufficient disputes of fact to warrant sending to the jury the

issue of whether Hayes-Bullock knew Lucent's financial statements were materially misstated.

The SEC points to the fact that Hayes-Bullock "certified" the March 14, 2000 business case for

the VPP contract which indicated April 1, 2000 as the date for "Period of Performance."  (SEC

Facts - Carter/Hayes-Bullock ¶ 66.)  The SEC also claims that when Berthold told Hayes-Bullock

that he thought AWS would not pay for the switches under the conventional pricing and Lucent

needed to account for "negative revenues" for the switches, Hayes-Bullock told him that they

needed to figure out a way to keep that as valid revenue in the quarter.  (Id. ¶ 98.)  The SEC is

somewhat vague about the timing of this conversation, only stating that it occurred in late third

quarter and fourth quarter.  (SEC Opp'n Br. to Carter/Hayes-Bullock at 17.)  In contrast, Berthold

testified that he could only recall having a conversation with Ms. Bullock in the fourth quarter.

(SEC Facts - Carter/Hayes-Bullock, Exh. 1 at 38-40.)  Like her involvement in drafting and

revising the September letters, this is post-fraud conduct.  It is only relevant if it sheds light on

whether she knew at the time of the alleged misleading statements that fraud would result.  As

with Carter, the fact that Lucent's senior management and outside auditors approved the

accounting of the switches tends to negate the notion that Hayes-Bullock knowingly aided and

FOR PUBLICATION

abetted a primary violation of the securities laws.  In short, the evidence which could permit a

jury to infer that Hayes-Bullock knew of the underlying fraud at the time of the misstatement is

wanting.  Hayes-Bullock's motion for summary judgment on the aiding and abetting liability

claim under Section 10(b) is granted.

**III.    Aiding and Abetting Violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-11 and 13a-13 and Primary Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1**

Section 13(a) of the Exchange Act and the SEC rules thereunder require issuers of

securities to file factually accurate periodic reports with the SEC and to disclose such additional

information as may be necessary to make the required statements not misleading.  See 15 U.S.C.

§ 78m(a); 17 C.F.R. §§ 240.13a-11, 240.13a-13 and 240.12b-20.  Implicit in these provisions is

the requirement that the information submitted be true, correct and complete.  See United States

v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991) (citations omitted).  Section 13(b) requires

issuers to keep accurate books and records and to maintain an adequate system of internal

controls.  See S.E.C. v. Cedric Kushner Promotions, Inc., 417 F. Supp. 2d 326, 337 (S.D.N.Y.

2006).

The SEC claims that the third, fourth, and fifth claims for relief are non-scienter claims.

Indeed, several courts have held that primary violations under Section 13 and the regulations

thereunder do not require a finding of scienter.  See, e.g., McConville v. S.E.C., 465 F.3d 780,

789 (7th Cir. 2006) (giving deference to the SEC's reasonable statutory interpretation that there

is no scienter requirement under section 13(b) or regulations thereunder); S.E.C. v. McNulty, 137

F.3d 732, 740 (2d Cir. 1998) (section 13 "contains no words indicating that Congress intended to

FOR PUBLICATION

impose a 'scienter' requirement").  However, as discussed, Section 20(e) of the Exchange Act

requires actual knowledge for all aiding and abetting violations under that Act.  See Part II.A.,

supra; 15 U.S.C. § 78t(e).  Thus, although primary violations under Section 13 may be sustained

without a showing of scienter, the SEC must show that defendants acted with actual knowledge

of the primary violation and their own role in furthering it to defeat summary judgment on the

aiding and abetting claims.  Cf. Ponce v. S.E.C., 345 F.3d 722, 737 (9th Cir. 2003).  The same

analysis for granting or denying defendants' summary judgment motion as to aiding and abetting

liability under Section 10(b) are equally applicable to the SEC's claims of aiding and abetting

violations under Section 13.  Accordingly, Dorn's motion for summary judgment on aiding and

abetting liability under Sections 13(a) and (b) is denied; the motions of Carter and Hayes-Bullock

are granted.

Finally, defendants' motions for summary judgment on the SEC's primary violation claim

under Section 13(b)(5) of the Exchange Act and Rule 13b2-1 are denied.  As noted, no scienter is

required to establish primary violations under Section 13(b)(5) and Rule 13b2-1.  See

McConville, 465 F.3d at 789.  Thus, although Carter and Hayes-Bullock are granted summary

judgment on the aiding and abetting claims under Section 13 because of the lack of evidence as

to their scienter, they are not similarly entitled to summary judgment on the primary violation

claim for that same reason.  Rule 13b2-1 provides: "No person shall directly or indirectly, falsify

or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the

Securities Exchange Act."  17 C.F.R. § 240.13b2-1.  To establish violations under this Rule, the

SEC need only prove that defendant "contributed to the issuance of materially misleading

**FOR PUBLICATION**

financial statements." Collins & Aikman, 524 F. Supp. 2d at 497.  The chief argument that

defendants raise in regard to this claim is that the record does not reflect what book or record was

falsified.  These objections are puzzling since the record clearly indicates which books or records

the SEC claims defendants falsified or caused to be falsified: With respect to Carter and Hayes-

Bullock, the relevant records are the financials for the third quarter of fiscal year 2000; as to

Dorn, the records at issue are the 10-Qs for the first and third quarters of fiscal year 2000 and

Form 8-K filed on October 24, 2000.  Because there are disputes of fact on whether Carter,

Hayes-Bullock, and Dorn contributed to the issuance of materially misleading financial

statements, their motions for summary judgment on the fifth count are denied.

## CONCLUSION

Aversano's motion for partial summary judgment on the primary violation of Section

10(b) is granted.  The Court grants Dorn's motion for summary judgment as to the primary

violation claim in the first count only; with respect to the aiding and abetting claim in the same

count and the remaining counts, the motion is denied.  The motions of Carter and Hayes-Bullock

for summary judgment are granted on first, third, fourth counts and denied as to the fifth count.

The motion to strike the expert reports of Sally L. Hoffman is denied.


s/William H. Walls
United States Senior District Judge

-48-

**FOR PUBLICATION**

**Appearances:**

Richard Hong
Frederick L. Block
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4010-A
          Attorneys for Plaintiff Securities and Exchange Commission

Stephen A. Best
Geoffrey H. Coll
Dewey & LeBoeuf, LLP
1101 New York Avenue, N.W.
Washington, D.C. 20005
          -and-
William G. Primps
Dewey & LeBoeuf, LLP
1301 Avenue of the Americas
New York, NY 10019
          Attorneys for Defendant Jay Carter

Lawrence M. Rolnick
Thomas E. Redburn, Jr.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068
          Attorneys for Defendant Michelle Hayes-Bullock

Barry Evenchick
Walder, Hayden & Brogan, P.A.
5 Becker Farm Road
Roseland, NJ 07068
          -and-
Carmen J. Lawrence
Teresa M. Venezia
Fried Frank Harris Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004-1980
          Attorneys for Defendant Alice Leslie Dorn

James E. Tonrey, Jr.
Wilentz, Goldman & Spitzer

**FOR PUBLICATION**

90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095
  -and-
Jyotin Hamid
Edwin G. Schallert
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
   Attorneys for Defendant Nina Aversano